**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**Northern Division**

| | |
|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE, *ex rel.* Ebony M. Thompson,<br><br>    Plaintiff,<br><br>    v.<br><br>X CORP., et al.,<br><br>    Defendants. | Civil Action No. 1:26-cv-02103-ELH |

**MEMORANDUM SUPPORTING MOTION TO DISMISS**
**FOR FAILURE TO STATE A CLAIM ON BEHALF OF DEFENDANTS X CORP., X.AI**
**CORP., AND X.AI LLC**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

LEGAL STANDARD .............................................................................................................. 4

ARGUMENT ........................................................................................................................... 5

I.      THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE CPO ........................... 5

    A.      Grok Is Not A Qualifying "Service" Under The CPO ............................................... 6

    B.      The Complaint Alleges No Actionable Statement Or Practices ............................... 8

        1.      The Complaint Does Not Properly Allege A Claim Of Deceptive
        Statements ......................................................................................................... 8

            (a)      The Alleged Statements Are Not Deceptive ................................... 9

            (b)      The Complaint Does Not Plead Materiality Or Injury ................. 12

            (c)      The Statements To Congress Are Immune Under *Noerr-*
            *Pennington* And Not Deceptive In Any Event .............................. 14

        2.      The City's Standalone Unfair-Trade-Practices Claim Is Meritless
        And Unconstitutional ..................................................................................... 16

    C.      Defendants' Alleged Statements And Practices Did Not Occur In
    Baltimore In An Offer For Sale ............................................................................... 19

    D.      If Construed To Apply Here, The CPO Would Exceed The City's
    Authority Under Maryland Law ............................................................................... 22

II.     ANY CLAIM IS BARRED BY SECTION 230 .................................................................. 23

    A.      Defendants Are Interactive Computer Service Providers Protected By
    Section 230(c)(1) ...................................................................................................... 24

    B.      Section 230(c)(2)(A) Independently Provides Immunity Because
    Defendants Acted In Good Faith To Remove The Objectionable Content .......... 29

CONCLUSION....................................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ........................................................................................................... 19

*Akers v. Md. State Educ. Ass'n*,
376 F. Supp. 3d 563 (D. Md. 2019) ................................................................................... 15

*Alexander v. Carrington Mortg. Servs., LLC*,
23 F.4th 370 (4th Cir. 2022) ............................................................................................. 14

*Alexander v. United States*,
509 U.S. 544 (1993) ........................................................................................................... 19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................. 4, 10, 11

*Assanah-Carroll v. Law Offs. of Edward J. Maher, P.C.*,
281 A.3d 72 (Md. 2022) ..................................................................................................... 22

*Awah v. Wells Fargo Dealer Servs., Inc.*,
2019 WL 410412 (Md. Ct. App. Jan. 31, 2019) ............................................................... 13

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ........................................................................................... 29

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................ 4, 13

*Bogard v. TikTok Inc.*,
2025 WL 3637035 (N.D. Cal. Dec. 15, 2025) ................................................................... 26

*Bryant v. Koppers, Inc.*,
2023 WL 3053017 (4th Cir. Apr. 24, 2023) ...................................................................... 21

*Chemist Corner, Inc. v. Epic Pharmacy Network, Inc.*,
2019 WL 4750293 (D. Md. Sept. 30, 2019) ........................................................................ 8

*Colossus Media, LLC v. Adalytics Rsch., LLC*,
2026 WL 653630 (D. Md. Mar. 9, 2026) ........................................................................... 16

*Cozzarelli v. Inspire Pharms. Inc.*,
549 F.3d 618 (4th Cir. 2008) ............................................................................................. 30

*Doe v. Cooper*,
842 F.3d 833 (4th Cir. 2016) ....................................................................................................18

*Doe v. Discord Inc.*,
2026 WL 1067574 (N.D. Ohio Apr. 20, 2026) ...........................................................................26

*Doe v. Grindr Inc.*,
128 F.4th 1148 (9th Cir. 2025) ............................................................................................10, 26

*Doe v. X Corp.*,
821 F. Supp. 3d 632 (N.D. Tex. 2026)......................................................................................25

*Engage Armament LLC v. Montgomery County*,
356 A.3d 79 (Md. 2026)......................................................................................................22, 23

*Fair Housing Council of San Fernando Valley v. Roommate.Com, LLC*,
521 F.3d 1157 (9th Cir. 2008) ...................................................................................................28

*Green v. H & R Block, Inc.*,
735 A.2d 1039 (Md. 1999) .........................................................................................................12

*Henderson v. Source for Pub. Data, L.P.*,
53 F.4th 110 (4th Cir. 2022) ......................................................................................................24

*Hibdon v. Safeguard Props., LLC*,
2015 WL 4249525 (D. Md. July 9, 2015)............................................................................16, 17

*Holiday Universal, Inc. v. Montgomery County*,
833 A.2d 518 (Md. 2003) ...........................................................................................................22

*Hufford v. Bank United, FSB*,
2011 WL 4985920 (D. Md. Oct. 18, 2011) ...............................................................................12

*IGEN Int'l, Inc. v. Roche Diagnostics GmbH*,
335 F.3d 303 (4th Cir. 2003) .....................................................................................................15

*Jones v. Twitter, Inc.*,
2020 WL 6263412 (D. Md. Oct. 23, 2020) ...............................................................................25

*Kaswell v. Wells Fargo Bank, N.A.*,
2014 WL 3889183 (D. Md. Aug. 6, 2014) ...................................................................................4

*Langford v. Joyner*,
62 F.4th 122 (4th Cir. 2023) ........................................................................................................4

*Legg v. Castruccio*,
642 A.2d 906 (Md. Ct. App. 1994) ......................................................................................17, 18

iii

*Lemma v. CalAtlantic Grp., Inc.*,
    643 F. Supp. 3d 564 (D. Md. 2022) ...............................................................................20, 21

*Lucas v. Moore Transp. of Tulsa, LLC*,
    2018 WL 4052194 (D. Md. Aug. 24, 2018) ............................................................... 13

*Luskin's, Inc. v. Consumer Prot. Div.*,
    726 A.2d 702 (Md. 1999) ........................................................................................ 12

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*,
    141 S. Ct. 13 (2020) ................................................................................................29

*Manning v. Caldwell for City of Roanoke*,
    930 F.3d 264 (4th Cir. 2019) ..................................................................................19

*Martinez v. Amazon.com Servs. LLC*,
    338 A.3d 636 (Md. 2025) .......................................................................................... 7

*McCrory Corp. v. Fowler*,
    570 A.2d 834 (Md. 1990) .........................................................................................22

*McGraw v. Loyola Ford, Inc.*,
    723 A.2d 502 (Md. Ct. App. 1999) ....................................................................11, 12

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*,
    606 U.S. 146 (2025) .................................................................................................. 7

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
    948 F. Supp. 2d 538 (D. Md. 2013) .........................................................................15

*Morris v. Osmose Wood Preserving*,
    667 A.2d 624 (Md. 1995) .....................................................................................20, 21

*M.P. ex rel. Pinckney v. Meta Platforms Inc.*,
    127 F.4th 516 (4th Cir. 2025) .................................................................... 25, 26, 27

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ..................................................................................24

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014) .................................................................................................15

*Oyathelemi v. L.J. Ross Assocs.*,
    2022 WL 4368156 (D. Md. Sept. 21, 2022) ............................................................16

*Peters v. Best Buy Stores, L.P.*,
    2022 WL 622304 (D. Md. Mar. 3, 2022)..................................................................16

iv

*Reno v. ACLU,*
      521 U.S. 844 (1997) ...................................................................................................19

*Singh v. Cigna Corp.,*
      918 F.3d 57 (2d Cir. 2019)..........................................................................................11

*Sterling v. Ourisman Chevrolet of Bowie Inc.,*
      2015 WL 2213708 (D. Md. May 8, 2015)...................................................................13

*U.S. Football League v. NFL,*
      1986 WL 5623 (S.D.N.Y. May 15, 1986) ..................................................................15

*Veney v. Wyche,*
      293 F.3d 726 (4th Cir. 2002) ......................................................................................27

*Wash. Suburban Sanitary Comm'n v. Phillips,*
      994 A.2d 411 (Md. 2010) ...........................................................................................22

*Williams v. Lendmark Fin. Servs., Inc.,*
      2014 WL 1255854 (D. Md. Mar. 25, 2014) .................................................................8

*Williams v. State,*
      340 A.3d 906 (Md. 2025) .............................................................................................7

*Xia Bi v. McAuliffe,*
      927 F.3d 177 (4th Cir. 2019) ........................................................................... 5, 11, 20

*Zeran v. Am. Online, Inc.,*
      129 F.3d 327 (4th Cir. 1997) ...............................................................24, 26, 28, 30

**Statutes, Regulations & Constitutional Provisions**

47 U.S.C. § 230...............................................................................................................23

47 U.S.C. § 230(b)(4) ......................................................................................................30

47 U.S.C. § 230(c) .............................................................................................. 24, 29, 30

47 U.S.C. § 230(e)(3) .......................................................................................................23

47 U.S.C. § 230(f)......................................................................................................24, 27

90 Fed. Reg. 58,499.........................................................................................................18

Baltimore City Code art. 2, § 4-1 ...................................................................... 5, 6, 12, 13

Baltimore City Code art. 2, § 4-2 .........................................................................5, 6, 7, 8, 20, 21

Baltimore City Code art. 2, § 4-4 ....................................................................................19

Baltimore City Code art. 2, § 4-5 .................................................................................19

Baltimore City Code art. 2, § 4-7 .................................................................................13

Md. Code, Com. Law § 13-101 ..................................................................................6, 7

Md. Code, Com. Law § 13-105 ...................................................................................17

Md. Code, Com. Law § 13-301 ..................................................................................8, 9

Md. Code, Com. Law § 13-302 ..................................................................................13,

Md. Code, Com. Law § 13-303 ...................................................................................20

Md. Const. Decl. of Rts. art. 13 ..................................................................................15

Md. Const. art. XI-A, § 3 ............................................................................................22

**Other Authorities**

*Subprofessional*, Merriam-Webster's Collegiate Dictionary 1244 (11th ed. 2020).........................7

*Subprofessional*, Webster's New World College Dictionary 1446 (5th ed. 2020) ..........................7

*Subprofessional*, Webster's Third New International Dictionary 2278 (1966)...............................7

**INTRODUCTION**

Plaintiff the Mayor and City Council of Baltimore (the City) brings this action against Defendants X Corp., X.AI Corp., and X.AI LLC (collectively Defendants)[1] seeking to hold Defendants liable for the decision by certain users of the publicly available AI platform Grok to create fake sexually explicit images of other people without their consent. To be clear, Defendants categorically condemn such abhorrent material and have been working tirelessly to develop robust, ever-improving safeguards designed to prevent criminals from creating it. But Defendants are not legally responsible for the actions of a small number of criminals who develop sophisticated techniques to evade those safeguards—no more than Google is responsible for threatening messages sent from Gmail accounts or Facebook is responsible for defamatory social-media posts.

It is thus no surprise that the City does not attempt to hold Defendants directly liable for Grok users' creation of sexually explicit images. Instead, the City alleges that Defendants engaged in "unfair and deceptive trade practices" under Baltimore's Consumer Protection Ordinance (CPO) because they stated that they "prohibit[]," or have "zero tolerance" for, nonconsensual sexually explicit images when, according to the City, some users "in practice" still created and shared such images through "sophisticated user prompts." *Id*. ¶¶ 13, 72, 73, 75, 85-86. This Court should summarily reject the City's novel theory of liability. The City fails to satisfy multiple independent requirements of the CPO, and at any rate the claim is barred by Section 230 of the federal Communications Decency Act (CDA).

**Failure To State A CPO Claim.** For four independent reasons, the City fails to state a claim under the CPO. *First*, Grok does not fall within any of the CPO's four categories of enumerated "services" for which unfair and deceptive trade practices are forbidden. *Second*, for

---

[1]  Although the Complaint uses "x.AI," the company is correctly styled as "X.AI." This memorandum uses "X.AI" to refer collectively to Defendants X.AI Corp. and X.AI LLC.

multiple reasons, the challenged statements and practices are not actionable under the CPO as either "deceptive" or "unfair." Most obviously, Defendants' representation that nonconsensual sexually explicit images should have no place on their platforms is not "deceptive" because some users bypass the rules to generate such images. A policy of "prohibit[ing]" does not bear on the measures taken to enforce that policy, nor does "zero tolerance" imply impenetrable defenses. The City also fails to plausibly allege that the statements, even if deceptive, were *materially* deceptive or were injurious to any Baltimore consumer, and the City impermissibly relies on statements made to the U.S. Congress—statements for which Defendants are immune from liability. Nor is the lawful offering of Grok an actionable trade practice, and certainly not an "unfair" one. *Third*, there cannot be a viable claim under the CPO because no challenged statements or conduct were made or done "in" a sale or offer for sale in Baltimore. That is particularly true for statements made or conduct done before January 7, 2026, while the image-editing tools were, as alleged, free and thus not for sale at all. *Finally*, applying the CPO to cover the highly publicized statewide and nationwide conduct at issue here would far exceed the City's authority under Maryland law to enact and enforce only local laws that do not have a substantial statewide or national effect.

**CDA Section 230.** Section 230 provides a separate route to dismissal. Section 230 gives interactive computer service providers like X Corp. and X.AI protection from suits seeking to treat them as publishers of their users' content or to hold them liable for their efforts to remove it. But that is exactly what the City is attempting here: It asks for a judicial remedy based on Defendants' allegedly inadequate efforts to remove user-generated sexualized content that Grok enabled, but to which it did not materially contribute. The City repeatedly acknowledges in the Complaint that the objectionable sexualized content is generated by user prompts and in accordance with what users direct Grok to produce. Section 230 thus separately forecloses the City's claim.

2

**BACKGROUND**

Grok is a "truth-seeking AI chatbot" with "frontier capabilities in conversation, coding, reasoning, and image and video generation." *Grok*, xAI, https://x.ai/grok; *see* Compl. ¶¶ 1, 62. "[M]arketed as a general-purpose AI assistant," Grok was developed by X.AI and launched in 2023. Compl. ¶ 1.

The City's Complaint centers on certain, unspecified users' alleged circumvention of X.AI's rules and safeguards to use Grok to create fake, sexualized images of real people without their consent. *See id.* ¶¶ 12, 62-64, 86.[2] According to the City, users did so through "two main channels: the X social media platform and the standalone x.AI/Grok app." *Id.* ¶ 34; *see id.* ¶ 35. For the five-month period from "August 7, 2025" until January 7, 2026, these tools were allegedly "broadly available" "for free to all users." *Id.* ¶¶ 45, 54-56. Only on January 8, 2026, did Defendants allegedly begin "to restrict these tools to paying users" on X, while still offering them for free to the public on the "standalone Grok app and website." *Id.* ¶¶ 55-59.

The City alleges that statements from X.AI and X Corp. (or statements of their representatives) about Grok were deceptive given the actions of certain users. These include statements to Congress, *see id.* ¶ 73, general marketing on Grok's website, *see id.* ¶ 62, and company and platform rules and policies, *see id.* ¶ 70. In substance, these allegedly deceptive statements fall into two categories: They either (a) represent that Defendants prohibit or have a "zero-tolerance policy" against nonconsensual sexually explicit images, *e.g.*, *id.* ¶ 73, or (b) promote Grok as a general-purpose AI product, *see, e.g.*, *id.* ¶ 62. The zero-tolerance-policy

---

[2] Defendants take all allegations as true only for purposes of this motion and do not concede the veracity of any portion of the Complaint. Defendants adamantly reject many of the gratuitous assertions that the City does not rely on for its legal theory—such as that any form of nonconsensual sexual imagery was considered remotely "acceptable, humorous, and encouraged," or that Defendants "prioritized revenue generation and user engagement" over "public safety." Compl. ¶¶ 50, 60. Those statements are categorically false.

statements are purportedly deceptive because Defendants have not "in practice" ensured that zero nonconsensual explicit images are produced on Grok. *Id.* ¶ 72. And the general-purpose statements are purportedly deceptive because Grok lacks "meaningful internal controls and safeguards designed to prevent harmful, abusive, or non-consensual outputs." *Id.* ¶ 62. In addition to these statements, the City alleges that letting the general public access Grok is "unfair" because it "exploit[s] consumers' lack of understanding" to produce "harmful content." *Id.* ¶¶ 91-93.

None of the alleged deceptive statements or unfair conduct in the Complaint is alleged to have occurred specifically in Baltimore. Instead, the City generically alleges that Defendants' statements "deceiv[ed] … Baltimore residents" because "it is likely" that hundreds of thousands of Baltimore residents use X based on "population size." *Id.* ¶¶ 90, 103. The City also does not allege that anyone (in Baltimore or otherwise) was deceived into using or paying for Grok based on the alleged misrepresentations, or that those statements deceived anyone into creating explicit images. Rather, the City alleges that committed rulebreakers used "sophisticated user prompts" and "creative prompting" so that the "safeguards [could] be circumvented." *Id.* ¶¶ 85-86.

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). That standard requires that it be "reasonable to infer liability against each Defendant based on the facts alleged." *Langford v. Joyner*, 62 F.4th 122, 126 (4th Cir. 2023). "[M]ere conclusory statements[] do not suffice," nor do "legal conclusion[s] couched as … factual allegation[s]." *Iqbal*, 556 U.S. at 678 (citation omitted).

A higher standard of "particularity" applies to the City's claim of deceptive conduct under the CPO because that claim "alleg[es] fraud or mistake." Fed. R. Civ. P. 9(b); *see Kaswell v. Wells*

4

*Fargo Bank, N.A.*, 2014 WL 3889183, at \*5 (D. Md. Aug. 6, 2014) ("[A]n MCPA claim[] is subject to the heightened pleading standards of [Rule] 9(b)." (citation omitted)).   While "intent" or "knowledge" may be "alleged generally," all other "circumstances constituting fraud or mistake" must be "state[d] with particularity."  Fed. R. Civ. P. 9(b); *see Xia Bi v. McAuliffe*, 927 F.3d 177, 184-85 (4th Cir. 2019) ("How and whether a party relied on a misstatement is every bit as much a 'circumstance constituting fraud' as any other element." (quoting Fed. R. Civ. P. 9(b))).

**ARGUMENT**

**I.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE CPO**

The CPO provides that "[i]n Baltimore City, a person may not engage in any unfair, abusive, or deceptive trade practice in … the sale, lease, rental, loan, or bailment of any … (i) consumer good; (ii) consumer realty; or (iii) consumer service," or an "offer for sale, lease, rental, loan, or bailment" of the same.  Baltimore City Code art. 2, § 4-2.  The CPO defines nearly all its terms—including "consumer"; "consumer goods"; "consumer services"; "sale"; "service"; and "unfair, abusive, or deceptive trade practices"—by reference to the statewide Maryland Consumer Protection Act (MCPA).  *Id.* § 4-1.

For four independent reasons, the City fails to state a claim under the CPO.  *First*, Grok does not fall within the ambit of the CPO at all because it is not a qualifying "service."  *Second*, the allegedly deceptive statements are not actionable, and the City provides no grounds for inferring that Defendants engaged in any nondeceptive "unfair" practices.  *Third*, neither the "deceptive" nor "unfair" practices theories rely on statements or conduct "in" an offer for sale in Baltimore.  *Finally*, if the CPO were construed to cover Defendants' statements and conduct, it would exceed the authority of Baltimore City under Maryland law to enact local laws.

### A.    Grok Is Not A Qualifying "Service" Under The CPO

The Complaint fails to state a claim because Grok is not a "service" within the meaning of the CPO.  The CPO does not enact a universal prohibition on all "unfair, abusive, or deceptive trade practices."  Instead, as relevant here, it prohibits such practices in (1) "the sale" or (2) "offer for sale" of any "consumer good," "consumer realty," or "consumer service."  *Id.* § 4-2(1)-(2).  The City does not allege Grok is a "good" or "realty."  The City instead rests its Complaint on the theory that Grok provides a consumer service by "generat[ing] novel content in response to user prompts." Compl. ¶ 3.

That theory collapses at the threshold because the CPO gives "service" a specialized, carefully delimited meaning: the identical meaning stated in the MCPA.  Baltimore City Code art. 2, § 4-1(12).  The MCPA defines "service" to mean any:

> (1) Building repair or improvement service;
> (2) Subprofessional service;
> (3) Repair of a motor vehicle, home appliance, or other similar commodity; or
> (4) Repair, installation, or other servicing of any plumbing, heating, electrical, or mechanical device.

Md. Code, Com. Law § 13-101(j).

Although the City repeatedly alleges that Defendants provide Grok as a "service," *see, e.g.*, Compl. ¶¶ 3, 14, 16, 19, 25-26, 29, 34, 45, the City nowhere alleges—let alone pleads facts showing—that Grok's image-generation and editing tools fall into any of the four categories of "service" in the MCPA.  That pleading deficiency is fatal.

And it is one that the City cannot overcome.  Grok's functions dispose of three categories immediately.  It performs no building repairs, no motor-vehicle or appliance repairs, and no plumbing, heating, electrical, or mechanical work.  Md. Code, Com. Law § 13-101(j)(1), (3)-(4).  That leaves only "[s]ubprofessional service." *Id.* § 13-101(j)(2).  As a matter of ordinary English

6

in 2023 (when the CPO was enacted) and 1967 (when the MCPA's definition was adopted), that term does not encompass an AI image-generation tool. The term denotes services "functioning or qualified to function below the professional level but distinctly above the clerical or labor level and usu[ally] under the supervision of a professionally trained person." *Subprofessional*, Merriam-Webster's Collegiate Dictionary 1244 (11th ed. 2020); *accord Subprofessional*, Webster's Third New International Dictionary 2278 (1966) (similar and distinguishing "[subprofessional] and clerical assistants"); *see also Subprofessional*, Webster's New World College Dictionary 1446 (5th ed. 2020) ("paraprofessional"). No one speaking ordinary English would think that Grok's image-generation tool fits into any of these definitions.

Nor does the MCPA's definition of "consumer services"—"services which are primarily for personal, household, family, or agricultural purposes," Md. Code, Com. Law § 13-101(d)(1)—help the City. That term incorporates the narrow definition of "service" in § 13-101(j) and therefore the same limitations.

Moreover, any attempt to treat "[s]ubprofessional service" as a catch-all for all services would render the other three categories surplusage. *See Martinez v. Amazon.com Servs. LLC*, 338 A.3d 636, 649 (Md. 2025) ("[W]e construe the statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." (citation omitted)). That reading would also make superfluous the CPO's separate coverage of offers for sale of "educational services," Baltimore City Code art. 2, § 4-2(3). It would also be in tension with the *noscitur a sociis* canon, which "counsels against reading the term … to be different in kind and broader than the other three terms." *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 160 (2025); *see Williams v. State*, 340 A.3d 906, 918 (Md. 2025) ("the meaning of a word is known from the accompanying words … so that general words are restricted to a sense

analogous to less general." (citation omitted)).  Here, the other three terms are discrete categories of services, so "[s]ubprofessional service" is likewise best read as being limited to a discrete type of service, not all services generally.

Thus, because the City alleges no facts that could plausibly place Grok or its image-generation tool within any of the four statutory categories, it fails to state a claim under the CPO as a matter of law under Rule 12(b)(6)—a conclusion that courts in this District have reached on multiple occasions when plaintiffs similarly failed to allege a "service" within the MCPA's definition.  *See Chemist Corner, Inc. v. Epic Pharmacy Network, Inc.*, 2019 WL 4750293, at *2-3 (D. Md. Sept. 30, 2019) (holding that a service offered by pharmacy benefit manager was not a "service" under the MCPA); *Williams v. Lendmark Fin. Servs., Inc.*, 2014 WL 1255854, at *5 (D. Md. Mar. 25, 2014) (finding credit life and disability insurance was not a "service" under a statute using the same "service" definition as the MCPA).  Like in those cases, the City here is "tr[ying] to fit a square peg into a round hole." *Chemist Corner*, 2019 WL 4750293, at *2.  For that reason, dismissal with prejudice is required; any amendment would be futile because the mismatch is definitional and cannot be cured by re-pleading facts that do not exist.

**B.      The Complaint Alleges No Actionable Statement Or Practices**

**1.      The Complaint Does Not Properly Allege A Claim Of Deceptive Statements**

The statements that the City targets are not "deceptive" because, as alleged, they are not false or misleading and neither material nor injurious to any consumer.  *See* Baltimore City Code art. 2, § 4-2; Md. Code, Com. Law § 13-301.  Separately and to the extent the City targets statements to Congress, those statements cannot serve as a basis for liability under the *Noerr-Pennington* doctrine.

### (a)   The Alleged Statements Are Not Deceptive

The City relies on three theories of deception under the CPO, and so in turn the MCPA: "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers"; "[f]ailure to state a material fact if the failure deceives or tends to deceive"; and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with … [t]he promotion or sale of any consumer goods, consumer realty, or consumer service." Md. Code, Com. Law § 13-301(1), (3), (9)(i); *see* Compl. ¶ 110.  Each of those theories requires a "false" or "misleading" or "decepti[ve]" statement or omission.  To meet that requirement, the City reasons that Defendants "engaged in deceptive acts and practices by affirmatively misrepresenting the safety, limitations, and governance of Grok and the X platform, while omitting material facts about Grok's design, functionality, and foreseeable risks." *See, e.g.*, Compl. ¶ 61.  Its Complaint, however, provides no facts to support that conclusion.

The City's principal theory of deception—on which it relies for nearly all the supposedly deceptive statements in the Complaint—is that Defendants promoted a zero-tolerance policy regarding sexually exploitative images but failed to sufficiently enforce that policy.  Specifically, the City alleges that "X represents to consumers that it prohibits non-consensual sexual content, bans the sexual exploitation of children, and permits only consensually produced adult nudity," and X.AI "likewise represents that Grok's use policies forbid sexualized depictions of real people and minors." Compl. ¶ 7.  "In spite of those representations," says the City, proscribed content nonetheless appears on X and Grok. *Id.* ¶ 8.  From there, the City reasons that these kinds of "zero tolerance" statements are not "meaningful" and must be deceptive "in practice" because malicious

9

users can violate Defendants' policies by employing "creative" and "sophisticated user prompts" to circumvent Defendants' safeguards. *Id.* ¶¶ 72, 84-90.

None of that is deceptive, false, or misleading. At most, these allegations show that certain users have developed methods to circumvent Defendants' policies—not that Defendants lied about having one. The City *agrees* (and alleges) that X Corp. and X.AI do, in fact, prohibit sexualized depictions of minors in their policies. *See, e.g.*, *id.* ¶ 86. And nothing is inconsistent about a platform categorically prohibiting certain user conduct by rule, on the one hand, and imperfectly enforcing the prohibition, on the other. It would not be "deceptive" for a police chief to say that a town takes a zero-tolerance policy toward shoplifting even if some—or many—shoplifting crimes continue to occur. Nor would it be deceptive for an app to represent that it is "designed to create a safe and secure environment for its users" even if some sophisticated users ultimately use the app to facilitate their crimes. *Doe v. Grindr Inc.*, 128 F.4th 1148, 1154 (9th Cir. 2025) (Section 230 case). Simply put, users' ability to circumvent Defendants' policies does not mean that Defendants lied about having those policies or that they are not taking the circumvention seriously. At a minimum, the alleged statements are "not only compatible with, but indeed [are] more likely explained by" an imperfectly enforced policy. *Iqbal*, 556 U.S. at 680.

Virtually all the statements that the City charges with deceptive character fall into this pattern. For instance, the City cites a statement that "X Corp. has 'zero tolerance for any forms of child sexual exploitation' and 'remove[s] certain media depicting physical child abuse to prevent the normalization of violence against children.'" Compl. ¶ 69; *see also id.* ¶ 66 ("purport to prohibit"); *id.* ¶ 68 ("prohibited or subject to zero tolerance"); *id.* ¶ 70 ("only permits"; "rules specifically forbid"; "ban"); *id.* ¶ 71 ("prohibits content"); *id.* ¶ 73 ("zero tolerance"; "[y]ou may not"; "we are determined to make X inhospitable"; "[w]e are taking aggressive action"); *id.* ¶ 75

10

("policy prohibits"); *id.* ¶ 76 ("[s]trictly [p]rohibited"; "does not support"; "restrictions exist"; "subject to 'core safety policies'").  But to repeat, Defendants' statements that they ban certain types of content on their platform are not rendered false merely because some customers use the platform to post that type of content.  In virtually every area of life where a flat prohibition exists, that prohibition is imperfectly enforced, often very imperfectly.  Thus, when a social-media platform represents that certain content is prohibited, no reasonable user would think that necessarily means such content will never appear.  To the contrary, the existence of some such content is the *reason* for the prohibition.  In fact, the City alleges that Defendants held out that "improvements [were] *ongoing* to block such requests entirely."  Compl. ¶ 80 (emphasis added).  If anything, Defendants honestly acknowledged that complete removal was a goal not yet achieved and that they are "actively working to improve [their] compliance efforts, rather than … expressing confidence in their complete (or even substantial) effectiveness."  *Singh v. Cigna Corp.*, 918 F.3d 57, 63-64 (2d Cir. 2019) (holding "reasonable investor would not" think that "descriptions of compliance efforts amounted to actionable assurances of actual compliance").

To the extent any statements can escape that fundamental problem, they are at best conclusory under normal plausibility pleading standards, let alone under Rule 9(b)'s "heighten[ed] pleading standards."  *Xia Bi*, 927 F.3d at 182; *see Iqbal*, 556 U.S. at 678.  For example, the City alleges that "Defendants market themselves and Grok as safe" and "rule-governed" and that Grok is promoted as "a responsible, general-purpose artificial intelligence assistant." Compl. ¶¶ 9, 62; *see id.* ¶ 4 ("market Grok as a general-purpose consumer product").  But even assuming generic, aspirational statements to that effect would be capable of being proven false—rather than "puffery of no legal consequence," *McGraw v. Loyola Ford, Inc.*, 723 A.2d 502, 513 (Md. Ct. App. 1999) (Hollander, J.)—the City does not allege any specific statements against which the Court could

11

measure such falsity or deception. The same problem applies to alleged failures to disclose. Compl. ¶¶ 63-64. The City does not allege specifically what needed to be disclosed and when, nor does it provide any specific "market[ing]" of "Grok as a general-purpose consumer product suitable for widespread use" in any way that is misleading, *id.* ¶ 65; *see id.* ¶ 12.

### (b)    The Complaint Does Not Plead Materiality Or Injury

As the Maryland Supreme Court has explained, the statutory definition of a deceptive practice or statement encompasses a "materiality element." *Luskin's, Inc. v. Consumer Prot. Div.*, 726 A.2d 702, 713 (Md. 1999) (addressing deceptive element of MCPA); *see* Baltimore City Code art. 2, § 4-1(13) (incorporating MCPA definition of "unfair, abusive, or deceptive trade practices"). A deceptive representation must be "a material misrepresentation," which in turn must "involve[] information that is important to consumers and, hence, likely to affect their choice of a product." *Luskin's*, 726 A.2d at 713 (cleaned up). And an omission is material "if a significant number of unsophisticated consumers would find that information important in determining a course of action." *Green v. H & R Block, Inc.*, 735 A.2d 1039, 1059 (Md. 1999). "[W]hen the facts do not allow for a reasonable inference of materiality," those facts are deficient "as a matter of law." *Id.*

Here, the City's claim fails because the City has not alleged that any supposed deceptive statements or omissions were material to any Baltimore consumer's decision to pay for Grok's features. As to statements, the City merely asserts that Defendants' policies and user rules about "the safety, limitations, and governance of Grok and the X platform … were material to consumers' decisions to use X and Grok and to upload images of themselves and others to those platforms." Compl. ¶ 61. As to omissions, the City repeatedly asserts that Defendants omitted "material facts" about Grok's design. *Id.* ¶¶ 12, 61, 74, 113(d). Such conclusory labels fail to state a claim even under Rule 8, let alone under the particularity required by Rule 9. *See Hufford v. Bank United, FSB*, 2011 WL 4985920, at *3 (D. Md. Oct. 18, 2011) (A "complaint must contain 'more than

12

labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" (quoting *Twombly*, 550 U.S. at 555)).  The City fails to explain how or why alleged misrepresentations or omissions in Defendants' policies were material to a consumer's decision to *use*, let alone *purchase*, Grok's alleged capabilities.  And it never alleges facts showing that consumers would have declined to purchase Grok's capabilities had they known that Defendants' zero-tolerance policy for sexually exploitative images was imperfectly enforced.  Simply put, without specific allegations to support materiality, the City's contentions rely entirely on "unwarranted" and "unreasonable inferences" that the Court "need not accept." *Lucas v. Moore Transp. of Tulsa, LLC*, 2018 WL 4052194, at *2 (D. Md. Aug. 24, 2018) (quotation marks omitted).

Relatedly, the City does not even try to establish plausible consumer injuries flowing from the alleged deception.  On the City's account, it need not prove consumer injury because under Section 13-302 of the MCPA, the City may bring a CPO claim "whether or not any [Baltimore] consumer in fact has been misled, deceived, or damaged as a result of that practice." Compl. ¶ 111 (quoting Md. Code, Com. Law § 13-302).  That view is mistaken twice over.  For one, Section 13-302 applies only in "an [MCPA] enforcement action brought by the Division of Consumer Protection of the Office of the Attorney General." *Awah v. Wells Fargo Dealer Servs., Inc.*, 2019 WL 410412, at *2 n.2 (Md. Ct. App. Jan. 31, 2019); *Sterling v. Ourisman Chevrolet of Bowie Inc.*, 2015 WL 2213708, at *7 (D. Md. May 8, 2015) (same).  This is not such an action.  And at any rate, although the CPO incorporates some provisions of the MCPA, the CPO does not incorporate Section 13-302 of the MCPA.  *See, e.g.*, Baltimore City Code art. 2, §§ 4-1, 4-7.  Thus, because the CPO is modeled after the MCPA—yet it specifically *does not incorporate* the injury waiver in Section 13-302—it follows that the CPO does not contain the no-injury rule added to the MCPA

13

by Section 13-302.  Put simply, there is no basis for the City to contend that it can assert a free-floating CPO claim without injury flowing from the alleged deception.

And because the City does not allege a plausible consumer injury, much less one caused by Defendants' alleged conduct, the Complaint must be dismissed.  Indeed, the City does not identify a single Baltimore consumer who was injured by Defendants' allegedly deceptive statements, such as by purchasing Grok when she otherwise would not have.  Compl. ¶¶ 96-107.  It does not allege that any Baltimore consumer complained of being duped by Defendants' policies or that any Baltimore consumer unsubscribed from Defendants' tools due to any alleged misrepresentations.  Instead, the City alleges injuries to persons who may have been the victims of prohibited third-party conduct without alleging that those individuals were injured because Defendants' alleged misrepresentations in Baltimore led them to purchase Grok when they otherwise would not have done so.  *See id.* ¶¶ 98-99; *cf. Alexander v. Carrington Mortg. Servs., LLC*, 23 F.4th 370, 380 (4th Cir. 2022) (affirming dismissal of MCPA claim that only "perfunctorily allege[d]" that the plaintiff's reliance on the allegedly deceptive conduct caused injury).  Ultimately, the City falls back to a kind of "collective harm[] on the public" from a "risk" of being exposed to certain objectionable sexual content.  Compl. ¶ 106.  But the CPO is not a vague, general public-harm or nuisance statute; it addresses deception or unfairness to consumers in the sale of certain services.  And here, those claimed injuries are caused by the content produced and then shared at the direction of third-party users (certainly regrettable), not injuries in the sale of Grok caused by any of Defendants' allegedly deceptive statements.

> **(c)     The Statements To Congress Are Immune Under *Noerr-Pennington* And Not Deceptive In Any Event**

The City's reliance on alleged statements to Congress is separately barred by the *Noerr-Pennington* doctrine, and the statements are not deceptive in any event.  Compl. ¶ 73.  "The *Noerr-*

*Pennington* doctrine grants First Amendment immunity to those who engage in petitioning activity." *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 310 (4th Cir. 2003); *accord* Md. Const. Decl. of Rts. art. 13 ("That every man hath a right to petition the Legislature for the redress of grievances in a peaceable and orderly manner."). "[A]lthough originally developed in the antitrust context, the doctrine has now universally been applied to business torts." *IGEN Int'l*, 335 F.3d at 310. "The application of *Noerr-Pennington* is a question of law," *id.*, that "can be considered by this Court on a motion to dismiss if the face of the complaint includes all necessary facts for the defense to prevail," *Akers v. Md. State Educ. Ass'n*, 376 F. Supp. 3d 563, 574 (D. Md. 2019) (citation and quotation marks omitted); *see, e.g.*, *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 948 F. Supp. 2d 538, 559 (D. Md. 2013) (granting motion to dismiss based on *Noerr-Pennington* doctrine).

Here, immunity is evident on the face of the City's Complaint. The City alleges that "[o]n January 31, 2024, X Corp.'s [then] CEO, Linda Yaccarino" "made … deceptive representations" "through written testimony submitted to the United States Senate Committee on the Judiciary." Compl. ¶¶ 73-74. These alleged misrepresentations to the U.S. Senate Committee on the Judiciary are immunized under *Noerr-Pennington* because "testimony before Congress is a clear-cut example of solicitation of governmental action through the legislative process." *U.S. Football League v. NFL*, 1986 WL 5623, at *1 (S.D.N.Y. May 15, 1986). A contrary holding would "chill[] the exercise of the First Amendment right to petition the government for the redress of grievances." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014).

Ms. Yaccarino's congressional testimony is not actionable because it was also not deceptive for two reasons. First, her January 31, 2024 testimony occurred a year and a half *before* the Complaint alleges that Grok's image-generation feature was introduced on "August 4, 2025."

Compl. ¶ 33.  Second, Ms. Yaccarino gave that congressional testimony—as X Corp.'s CEO—before X Corp. and X.AI merged, so the testimony was not even about Grok at all.  *See* Tesla, Inc., Annual Report (Form 10-K/A (Amendment No. 1)) (April 30, 2025), at 1 (noting the March 2025 merger of X and X.AI).[3]  The City fails to explain how a statement could be deceptive when the alleged deception is premised on facts and a state of the world that did not yet exist.

Accordingly,  Ms. Yaccarino's testimony cannot give rise to CPO liability.

**2.    The City's Standalone Unfair-Trade-Practices Claim Is Meritless And Unconstitutional**

The City alleges that "[i]ndependently of deception," Defendants, "through Grok, have engaged in unfair practices."  Compl. ¶ 91.  But the City fails to identify with the required specificity what "practices" it is challenging, much less explain why they are "unfair."

To allege an unfair-trade-practices claim, a plaintiff must first "identify a trade 'practice' that is [allegedly] unfair[.]"  *Peters v. Best Buy Stores, L.P.*, 2022 WL 622304, at *6 (D. Md. Mar. 3, 2022) (citation omitted); *Oyathelemi v. L.J. Ross Assocs.*, 2022 WL 4368156, at *18 (D. Md. Sept. 21, 2022) (same).  In other words, the allegedly unfair "activities" must "constitute[] a 'practice' of the trade . . . not merely an 'act' that occurs in the course of trade activities, even if it may harm the consumer."  *Hibdon v. Safeguard Props., LLC*, 2015 WL 4249525, at *7 (D. Md. July 9, 2015).  The activities must consist of "the 'common' procedure, possibly 'formally adopted,' 'repeated or customary,' 'the usual way' that" a business engages in its trade such that "they are the result of the operating policy or customary practice of that business."  *Id.* (emphasis omitted).  Here, the City does not identify any trade "practices" as that term is used in the CPO.  Instead, it notes that Grok merely exists "in the marketplace," allegedly "without meaningful"

---

[3]    "The court may take judicial notice of matters of public record, including SEC filings, on a motion to dismiss."  *Colossus Media, LLC v. Adalytics Rsch., LLC*, 2026 WL 653630, at *6 (D. Md. Mar. 9, 2026).

safeguards, and then tosses in conclusory allegations that some Grok users treat Grok as "a powerful content-generation system" for "harmful content." Compl. ¶¶ 92-93. But the City fails to explain how or why its vague claims of unfair conduct implicate a practice of Defendants' trades. *Hibdon*, 2015 WL 4249525, at *8 (dismissing MCPA claim for failure to identify a trade practice).

Even assuming the City's vague allegations concerning Grok's mere existence in the marketplace sufficiently implicate a trade practice, the City fails to explain why that practice is *unfair*. The City does not even attempt to tie its unfairness theory to one of the 14 listed "[u]nfair, abusive, or deceptive trade practices" under the MCPA (and by extension the CPO). Instead, the City simply cites to MCPA § 13-105, which states that the term "unfair or deceptive trade practices" must be construed with "due consideration and weight … given to" interpretations of unfairness by the Federal Trade Commission (FTC) and the federal courts. *See* Compl. ¶ 111. And as the City itself admits, *id.*, whether a trade practice is unfair under the FTC's interpretation depends on whether the practice injures consumers and whether it violates established public policy, *see Legg v. Castruccio*, 642 A.2d 906, 915 (Md. Ct. App. 1994). But not any injury suffices. The injury to consumers must be "substantial," it must not be "outweighed by any countervailing benefits to the consumer or to competition that the practice produces," and it "must not be the type of injury that a consumer could reasonably have avoided." *Hibdon*, 2015 WL 4249525, at *4. The City fails to allege facts meeting this three-part test.

Substantial consumer injuries typically "involve[] monetary harm," not "[e]motional impact and other more subjective types of harm." *Legg*, 642 A.2d at 916 (citation omitted). The City does not explain how Grok's mere existence and availability to users could result in that type of substantial harm. Indeed, the City has not even attempted to identify any type of monetary harm to consumers here. Instead, the City's theories of harm to unidentified people are premised on

17

emotional harms like "fear, distress, and anxiety" that may be associated with certain nonconsensual sexualized images. Compl. ¶¶ 96-107.  The City also fails to address Grok's "countervailing benefit" to consumers, particularly considering generative AI like Grok "actually benefits Maryland consumers at large." *Legg*, 642 A.2d at 918.  And, aside from two conclusory allegations, Compl. ¶¶ 93, 114, the City fails to allege that consumers could not have reasonably avoided any claimed injuries.

In addition to failing on the injury element, the City fails to identify on-point, established public policy concerning generative AI like Grok.  To be "established," a public policy must "be declared or embodied in formal sources such as statutes, judicial decisions, or the Constitution as interpreted by the courts, rather than being ascertained from a general sense of the national values. The policy should likewise be one that is widely shared, and not the isolated decision of a single state or single court." *Legg*, 642 A.2d at 916 (citation omitted).  Simply put, there are no "widely shared" policies concerning generative AI because it is so novel.  If anything, public policy weighs in favor of minimal restrictions on generative AI.  Exec. Order No. 14,365, Ensuring a National Policy Framework for Artificial Intelligence, 90 Fed. Reg. 58,499 (Dec. 16, 2025) ("It is the policy of the United States to sustain and enhance the United States' global AI dominance through a minimally burdensome national policy framework for AI.").

The City has failed to establish a plausible freestanding unfair-trade-practices claim.

But to the extent the Court would be inclined to believe, despite those defects, that the CPO's prohibition against "unfair" trade practices could apply to Defendants' design of Grok, the CPO would be unconstitutionally vague.  A municipal ordinance "violates due process if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Doe v. Cooper*, 842 F.3d 833,

18

842 (4th Cir. 2016) (citation omitted); *see also Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272-73 (4th Cir. 2019) ("[I]f criminal penalties may be imposed for violations of a law, a stricter standard is applied in reviewing the statute for vagueness."). Here, the CPO provides for "a civil penalty of not more than $1,000" for "[e]ach violation" on "[e]ach day upon which a violation continues," Baltimore City Code art. 2, § 4-3; *see id.* § 4-5(d), and it provides for criminal liability for the same conduct that is subject to civil penalties, *id.* § 4-4. Under vagueness principles, the City cannot enact a law whose governing standard is solely that it bans conduct that—to some unspecified degree—"injures consumers" and "violates established public policy," Compl. ¶ 111, and then fine or imprison violators on the basis that their conduct had negative consequences. But the City's unfairness theory of liability here purports to do exactly that. Moreover, because the City's theory is that Grok "injures" the public because of the speech that it is used to produce (what the City calls "harmful content," Compl. ¶ 94), the "many ambiguities concerning the scope of its coverage render it problematic" under the stricter vagueness standards "of the First Amendment," *Reno v. ACLU*, 521 U.S. 844, 870 (1997); *see also infra* Part II (explaining that Section 230 also precludes imposing liability on Defendants for the content users produce through Grok). That is doubly true given the requested relief, which includes "injunctive relief requiring Defendants to reform" their "platform design" and mandating "enhanced marketing restrictions," Compl. at Request for Relief, which would easily amount to both prior restraint and unconstitutionally compelled speech, *see Alexander v. United States,* 509 U.S. 544, 550 (1993); *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023).

   C.     **Defendants' Alleged Statements And Practices Did Not Occur In Baltimore In An Offer For Sale**

The CPO prohibits unfair and deceptive practices only if those practices occur "[i]n Baltimore City" and "in … the sale" or "the offer for sale" of, as relevant here, a "consumer

19

service." Baltimore City Code art. 2, § 4-2. The parallel provision in the MCPA is similarly limited to practices that occur "in … the sale" or "the offer for sale" of "consumer services." Md. Code, Com. Law § 13-303. The Supreme Court of Maryland strictly construes this language to mean what it says, holding that the allegedly "deceptive trade practice must occur *in* the sale or offer for sale to the consumer." *Morris v. Osmose Wood Preserving*, 667 A.2d 624, 635 (Md. 1995) (emphasis added). The court has further explained that this language expressly "does not sweep as broadly as the language" in other States' consumer-protection laws, which have been "liberally expanded" by legislatures to "encompass[] any attempt directly or indirectly to sell." *Id.* at 636 (cleaned up); *accord Lemma v. CalAtlantic Grp., Inc.*, 643 F. Supp. 3d 564, 573 (D. Md. 2022) ("[T]he MCPA applie[s] only to unfair or deceptive trade practices or misrepresentations made 'in' the sale and d[oes] not 'sweep as broadly' as another statute that covered unlawful practices made 'in *connection* with the sale[]' of goods." (emphasis added) (citation omitted)).

Thus, it is not sufficient to allege misleading statements were made "indirectly" to the consumer or "'in connection with' the sale to the consumer." *Morris*, 667 A.2d at 636. Rather, a plaintiff must allege that the statements "so infect[ed] the sale or offer for sale to a consumer that the law would deem the practice to have been committed 'in' the sale or offer for sale." *Id.* at 635. Put differently, to state a claim, the "defendant's statement" must have been "*necessarily* and *directly* transmitted to the consumer as a part of the sale to the consumer." *Id.* at 637 (emphasis added); *see Lemma*, 643 F. Supp. 3d at 573. Moreover, under Rule 9(b), that "circumstance" must be pleaded with particularity. *See Xia Bi*, 927 F.3d at 184-85.

Here, the City has not met these requirements. Even though the City concedes that the CPO should be construed "in line with the Maryland Consumer Protection Act," Compl. ¶ 109, the City does not specifically allege that any practices or related offers, sales, or transactions occurred

20

in Baltimore.   To the contrary, the Complaint contains only rote, conclusory allegations that "Baltimore residents" were "expos[ed]" to certain content or statements but divorced from any transactions or offers for sale.  *E.g.*, Compl. ¶ 96.  That is dispositive.  The City does not allege any "sale" or "offer for sale" of Grok in Baltimore.

That fundamental defect aside, the Complaint must at a minimum be dismissed as to all statements and conduct before January 8, 2026.  That is because before that date, Grok's image-generation and image-editing features were "available for free to all users."  Compl. ¶¶ 45, 55.  So any allegedly deceptive or unfair practices before January 8, 2026, could not possibly have occurred "in … the sale" or "the offer for sale" of those features.  CPO § 4-2.

The only remaining allegations after January 8, 2026, arise from X Corp.'s "X Rules" and X.AI's "Acceptable Use Policy" that "Defendants continued to publish."  Compl. ¶¶ 66-79.  But even as to those rules and use policies, the Complaint is deficient as to the "sale" or "offer for sale" element.  To the extent these rules apply specifically to paying users (which the City does not allege), the City does not come close to alleging these user rules "so infect[ed] the sale or offer for sale to a consumer that the law would deem the practice to have been committed 'in' the sale or offer for sale."  *Morris*, 667 A.2d at 635.  The City does not allege any particularized "circumstances," for example "the time, place, and contents" of transactional communications, in which the allegedly deceptive statements were necessarily and directly transmitted to potential Baltimore customers.  *Bryant v. Koppers, Inc.*, 2023 WL 3053017, at *1 (4th Cir. Apr. 24, 2023) (citation omitted).  Instead, these policies "were, at best, made 'in connection with'" the sale of Grok "not 'in' the sale" itself, so they are "insufficient" as a matter of law.  *Lemma*, 643 F. Supp. 3d at 573 (citation omitted).

**D.    If Construed To Apply Here, The CPO Would Exceed The City's Authority Under Maryland Law**

The Maryland Constitution grants the City the power only "to enact local laws." Md. Const. art. XI-A, § 3. Thus, where a local government "attempts to enact an ordinance on matters of significant interest to the entire state," the Maryland Supreme Court has "determined that it is not, in fact, 'a local law.'" *Assanah-Carroll v. Law Offs. of Edward J. Maher, P.C.*, 281 A.3d 72, 90 (Md. 2022) (quotation marks omitted). Similarly, "a law that is executed in only one county but substantially affects persons and entities outside of the county is not a local law." *Engage Armament LLC v. Montgomery County*, 356 A.3d 79, 118 (Md. 2026) (quotation marks omitted). This is true even when the law is facially "confined to a single county" but nevertheless affects non-local interests in certain "application[s]." *Id.* at 118, 120 (alteration omitted); *see also McCrory Corp. v. Fowler*, 570 A.2d 834, 838 (Md. 1990) ("creating a remedy which has traditionally been the sole province of the General Assembly and the Court of Appeals, to combat a statewide problem … goes beyond a 'matter[] of purely local concern.'"), *superseded by statute as stated in Wash. Suburban Sanitary Comm'n v. Phillips*, 994 A.2d 411, 424 (Md. 2010).

*Engage Armament* is instructive as to how that standard applies here. There, the Maryland Supreme Court held that a county regulation prohibiting individuals from carrying firearms within 100 yards of places of public assembly in the county was an impermissible general law. 356 A.3d at 120. Though "local in form," the county regulation was general in "*application*" to those individuals "traveling on public highways who cross within 100 yards of a place of public assembly." *Id.* at 119-20 (emphasis added). This application would affect "traffic originating in other locations throughout Maryland and beyond" and would "impose[] a burden on travel 'of significant interest not just to any one county, but rather to more than one geographical subdivision, or even to the entire state.'" *Id.* at 120 (quoting *Holiday Universal, Inc. v. Montgomery County*,

22

833 A.2d 518, 524 (Md. 2003)).   Accordingly, the Maryland Supreme Court concluded the regulation was "not a local law, and so [was] beyond the legislative authority of the County."  *Id.* at 121.   Put simply, a purportedly local law that is applied in a way that regulates, deters, or sanctions conduct with statewide or nationwide implications is not truly a local law at all.

Against this backdrop, the City's application of the CPO here is clearly not a "local law." Grok is "offered to consumers throughout the United States."  Compl. ¶ 14.   Indeed, one of the bases for the City's complaint is that "[g]enerative artificial intelligence ('GAI') products [like Grok] have rapidly entered consumer markets with minimal regulation and limited transparency." Compl. ¶ 30.  The City hopes to step in to fill the vacuum not by seeking to sanction anything that Defendants did in Baltimore.  Rather, through civil penalties and injunctions aimed at redesigning both X and Grok, the City seeks to punish Defendants for their nationwide marketing, their general terms of service for all users, some statements to the United States Senate Committee on the Judiciary, and general design and moderation practices platform-wide.  If successful, the City will not affect Defendants' products only for Baltimore users, but for all users nationwide.  Thus, like in *Engage Armament*, the City's efforts to apply the CPO against Defendants improperly transform the CPO into a general law, not a local law.

## II.   ANY CLAIM IS BARRED BY SECTION 230

Independent of the deficiencies internal to the City's CPO claim described above, the Court should dismiss the City's CPO claim for the independent reason that it is barred by Section 230 of the CDA, 47 U.S.C. § 230, which grants interactive computer service providers, like X Corp. and X.AI, a broad immunity from lawsuits.

Section 230(e)(3) provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  Here, the City's efforts to impose liability on Defendants through the CPO claim are inconsistent with two Section

23

230 provisions. First, Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Second, Section 230(c)(2)(A) immunizes those same providers against liability for any act "voluntarily taken in good faith to restrict access to or availability of material" that they consider explicit or objectionable. The City trips both provisions by trying to hold Defendants liable both for their users' content and for Defendants' efforts to remove it.

### A. Defendants Are Interactive Computer Service Providers Protected By Section 230(c)(1)

"By its plain language, § 230[(c)(1)] creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). A defendant "must establish three things to claim protection: (1) The defendant is a 'provider or user of an interactive computer service'; (2) the plaintiff's claim holds the defendant 'responsible as the publisher or speaker of any information'; and (3) the relevant information was 'provided by another information content provider.'" *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 119 (4th Cir. 2022) (quoting *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (internal quotation marks omitted)). Here, Defendants satisfy each prong.

*First*, X Corp. and X.AI are providers of "interactive computer service[s]." Section 230(f) defines "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." X Corp. "owns and operates" X, a "social media platform formerly known as Twitter." Compl. ¶ 1 n.1. X.AI in "coordinat[ion] with X

24

Corp." "own[s,] control[s], and operate[s] Grok," "a generative artificial intelligence system … distributed to consumers through the X (formerly Twitter) platform." *Id.* ¶¶ 27, 32. Courts have repeatedly concluded that both X Corp. and X.AI meet the definition of an interactive computer service provider. *See Doe v. X Corp.,* 821 F. Supp. 3d 632, 635, 641 (N.D. Tex. 2026) ("Section 230 immunizes X and xAI, barring Plaintiff's claims."); *see also Jones v. Twitter, Inc.*, 2020 WL 6263412, at *3 (D. Md. Oct. 23, 2020) ("There is no question that Twitter is a provider of an interactive computer service[.]" (collecting cases)).

*Second*, the City seeks to hold Defendants responsible as the publishers of information. A claim treats "the defendant 'as the publisher or speaker of any information' under § 230(c)(1) if it (1) bases the defendant's liability on the disseminating of information to third parties and (2) imposes liability based on that information's improper content." *Henderson*, 53 F.4th at 123. The specific language a complaint uses to describe defendants' conduct is irrelevant; instead, the analysis turns on the substance of "what a plaintiff in a particular case must prove." *M.P. ex rel. Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 525 (4th Cir. 2025).

The City's claims satisfy this two-part test. At its core, the City's CPO claim seeks to hold Defendants liable because (1) third parties used Grok to produce and disseminate certain harmful images and (2) Defendants failed to prevent, monitor, and take down those images, even though Defendants had policies and made statements representing that they would do so. *See* Compl. ¶ 113. Indeed, the Complaint goes to great lengths to paint X Corp. and X.AI's moderation policies and statements from certain employees about those policies as deceptive and misleading. *See id.* ¶¶ 62-90. In other words, the City alleges that Defendants did not do enough to moderate the output of a neutral tool, the exact "exercise of a publisher's traditional editorial functions"—"deciding whether to publish, withdraw, postpone or alter content"—that falls under Section 230.

25

*Zeran*, 129 F.3d at 330. Such efforts to challenge moderation policies have long been found to fall within Section 230's scope. *See Grindr*, 128 F.4th at 1154 (holding that an app provider targeted by a misrepresentation claim over its "moderation policy" was "protected from liability under § 230"); *Doe v. Discord Inc.,* 2026 WL 1067574, at *12 (N.D. Ohio Apr. 20, 2026) (Section 230 bars plaintiff's "claims seek[ing] to hold Discord liable for alleged 'misrepresentations' by failing to conform its content moderation standards—based on what amounts to its general 'aspirational' standards of seeking to provide a platform 'safe for minors'—to a level defined by Plaintiff"); *Bogard v. TikTok Inc.*, 2025 WL 3637035, at *19 (N.D. Cal. Dec. 15, 2025) (claims regarding statements that "are either merely descriptions of Defendants' moderation policies or otherwise non-actionable statements made to others during a Senate hearing" are "barred by Section 230").

Likewise, to the extent the City alleges that Grok was designed to promote the distribution of sexualized images, *see, e.g.*, Compl. ¶ 44, the result is the same: It is still seeking to hold Defendants liable as a publisher under Section 230(c)(1)'s second element. *Meta Platforms* makes that clear. There, the plaintiff targeted Facebook's algorithm for distributing content. 127 F.4th at 525. The Fourth Circuit found that Section 230(c)(1) shielded Meta from liability because the plaintiff could not show that "Facebook's algorithm was designed in a manner that was unreasonably dangerous for viewers' use without also demonstrating that the algorithm prioritizes the dissemination of one type of content over another." *Id.* The same is true here with regard to how Grok was designed—the City cannot prevail without demonstrating how Grok prioritizes the creation of certain content and then proving that Defendants misrepresented that prioritization.

*Third*, the sexualized content the City challenges was created by users, not Defendants. Under Section 230, a provider loses immunity only when it is "'responsible, in whole or in part, for the creation or development'" of the information at issue. *Henderson*, 53 F.4th at 127 (quoting

26

47 U.S.C. § 230(f)(3)).  That occurs only where the provider "directly and materially contributed to what made the content itself unlawful."  *Id.* (quotation marks omitted).  The City has not pleaded that Defendants' conduct amounts to such a material contribution.

At best, the City alleges that Grok "exercis[es] autonomous control over the" challenged "sexualized images," Compl. ¶ 10, and "autonomously produces sexualized imagery," *id.* ¶ 44.  But those allegations do not meet the material-contribution test.  That is because they mischaracterize both the City's remaining allegations and the applicable legal standard.  For instance, the City concedes in multiple places that Grok "generate[s] novel content" only "*in response to user prompts*."  *Id*. ¶¶ 3, 34 (emphasis added).[4]  As alleged, the users, not Grok, make the material contribution.  Users choose "existing posts or upload a photo."  *Id.* ¶ 38.  Users then "ask Grok to 'undress' or 'nudify' [those] photos of third parties" that users have uploaded to the "X social media platform" or "the standalone x.AI/Grok app."  *Id.* ¶¶ 34-35.  Finally, "users … generate images" based on their inputs "with the '@Grok' chatbot or with the 'edit image' button" on X by directing Grok through the requests they choose to make.  *Id.* ¶ 36.  The objectionable nature of an image is determined by what the user directs Grok to produce, not by Grok itself.

That distinction is paramount.  Section 230 does not ask whether a provider contributed any technical capability to the content at issue.  *Accord Meta Platforms*, 127 F.4th at 526 (Section 230 protects "Facebook's use of its algorithm to arrange and sort racist and hate-driven content").

---

[4]    The City's assertion in paragraph 10 that "Grok itself generated and distributed sexualized images of real individuals, exercising autonomous control over the content it produced rather than merely transmitting third-party material," Compl. ¶ 10, is thus contradicted by the Complaint itself, *cf. Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (courts need not "accept as true allegations that contradict matters properly" before the court on a motion to dismiss).  Taken at face value, though, this allegation only demonstrates that the City has failed to state a claim:  If Grok autonomously created the content at issue, that would only confirm that representations regarding what *users* are permitted to do on Grok are beside the point and, in any event, true.

Instead, it asks whether the provider "directly and materially contributed to what made the content *itself unlawful*." *Henderson*, 53 F.4th at 127 (emphasis added and quotation marks omitted). As alleged, Grok makes no independent contribution to the objectionable nature of the images. *See* Compl. ¶¶ 3, 34. What makes any particular Grok-generated image unlawful is the user's decision to request a sexualized depiction of a real, non-consenting person. *See id.* ¶¶ 34-35. True, Grok's general capability to process image-editing requests does, as the City says, "enable[]" the creation of unlawful images. *Id.* ¶ 64. But that enabling no more directly and materially contributes to the unlawfulness of a specific image than Microsoft Word enables a defamatory text by following a user's keyboard strokes or Photoshop enables unlawful images by permitting users to manipulate photographs to make people appear nude. All are neutral tools that enable content creation but only in response to user inputs. *Cf. Fair Housing Council of San Fernando Valley v. Roommate.Com, LLC*, 521 F.3d 1157, 1169 (9th Cir. 2008) (en banc) (explaining that a search engine does not "contribute[] to any alleged unlawfulness" by "providing *neutral* tools to carry out what may be unlawful or illicit searches").

The City's effort to recast Grok as content creator also undermines the purpose of Section 230. "[R]ecogniz[ing] the threat that tort-based lawsuits pose[d] to freedom of speech in the new and burgeoning Internet medium," Congress enacted Section 230 "to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum." *Zeran*, 129 F.3d at 330. Thus, in Section 230, "Congress made a policy choice … not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." *Id.* at 330-31.

Indeed, the City's cramped understanding of Section 230 would strangle the emerging AI industry. If a provider's use of AI to process and respond to user requests were sufficient to

28

disqualify it from Section 230 protection, that immunity would be effectively abolished for every modern AI-assisted tool, exposing AI companies to all manner of liability for defamation, privacy torts, and numerous other types of claims. That would undermine the basic purpose of protecting "freedom of speech" in a "new and burgeoning" technology. *Id.* at 330. And if Section 230's protections are to be withheld from generative AI—a decision with sweeping consequences for American innovation and national security—that is a "policy choice" for Congress to make, not one for a single municipality to engineer through an unprecedented application of a local consumer-protection ordinance. *Id.*

**B.      Section 230(c)(2)(A) Independently Provides Immunity Because Defendants Acted In Good Faith To Remove The Objectionable Content**

Alternatively, independent from Section 230(c)(1), Section 230(c)(2)(A) "provides an additional degree of immunity when companies take down or restrict access to objectionable content, so long as the company acts in good faith." *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 15 (2020) (Thomas, J., statement respecting denial of certiorari). "Crucially, the persons who can take advantage of this liability shield are not merely those whom subsection (c)(1) already protects, but *any* provider of an interactive computer service[,] … even those who cannot take advantage of subsection (c)(1)." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009). The statute requires three showings: (1) the defendant is an interactive computer service provider; (2) the defendant took an action to restrict access to material; and (3) that action was taken in good faith on the basis that the material was objectionable. 47 U.S.C. § 230(c)(2)(A). Based on the Complaint, all three are satisfied here.

*First*, X Corp. and X.AI are interactive computer service providers. *Supra* pp.24-25.

*Second*, the City alleges that Defendants took actions to restrict access to Grok's image-generation features but did not (in the City's view) go far enough. For instance, the City faults

29

Defendants for "restrict[ing] certain image-generation features to paying users," Compl. ¶ 11, and objects that Defendants' restrictions applied only within "certain contexts on X," *id.* ¶ 59. The City even concedes that Defendants publicly stated their intent to "block such requests entirely" and described improvements that were "ongoing." *Id.* ¶ 80. Each of these allegations confirms that Defendants took some action to restrict access to the content the City challenges, which is all the statute requires. 47 U.S.C. § 230(c)(2)(A) (providing immunity for "*any action … to restrict access to or availability of material*" (emphasis added)).

*Third*, Defendants' good faith is evident from the Complaint. Defendants maintained publicly available terms of service expressly prohibiting nonconsensual sexual imagery, child sexual exploitation, and manipulated intimate media. Compl. ¶¶ 66-79. They responded to reports of abuse by issuing public statements, acknowledging the issue, and implementing access restrictions. *Id.* ¶¶ 80-83. The City's assertion that those steps were inadequate simply reflects the City's disagreement with the scope and speed of Defendants' response, not bad faith.

At bottom, "Congress enacted § 230's broad immunity 'to remove disincentives for the development and utilization of blocking and filtering technologies'" that would arise if "the specter of liability" accompanied any decision to "block[] and screen[] offensive material." *Zeran*, 129 F.3d at 331 (quoting 47 U.S.C. § 230(b)(4)). Holding Defendants liable for moderating Grok imperfectly would produce exactly the chilling effect on content-moderation decisions that Section 230(c)(2)(A) was enacted to prevent, and accordingly it provides an alternative basis for immunity.

## CONCLUSION

For all these reasons, the Court should dismiss the Complaint as to Defendants. Because many of the deficiencies here are not curable, the Court should dismiss with prejudice. *See Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 630 (4th Cir. 2008).

Dated:   June 29, 2026

                                   Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By:   */s/ Jonathan G. Cooper*

John F. Bash (*pro hac vice*)
300 West 6th St, Suite 2010
Austin, TX 78701
(737) 667-6100
johnbash@quinnemanuel.com

Nicholas J. Caluda (*pro hac vice*)
700 Louisiana Street Suite 3900
Houston, TX 77002
(713) 221-7000
nicocaluda@quinnemanuel.com

Nolan K. Anderson (*pro hac vice*)
1109 First Avenue Suite 210
Seattle, WA 98101
(206) 905-7000
nolananderson@quinnemanuel.com

Jonathan G. Cooper (D. Md. Bar No. 21345)
Zachary J. Lustbader (*pro hac vice*)
555 13th Street NW Suite 600
Washington, D.C. 20004
(202) 538-8000
jonathancooper@quinnemanuel.com
zachlustbader@quinnemanuel.com

Christopher Clore (*pro hac vice*)
William Jackson Vallar (*pro hac vice*)
295 5th Ave. 9th Floor
New York, NY 10016
(212) 849-7000
christopherclore@quinnemanuel.com
jackvallar@quinnemanuel.com

*Counsel for X Corp., X.AI Corp., and X.AI LLC*

31