**UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
Northern Division**

|  |  |
|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE, *ex rel.* Ebony M. Thompson, <br><br> *Plaintiff*, <br><br> v. <br><br> X CORP., *et al*., <br><br> *Defendants*. | Civil Action No. 1:26-cv-02103-ELH |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS
X CORP., X.AI CORP., AND X.AI LLC'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

LEGAL STANDARD ........................................................................................................... 4

ARGUMENT ........................................................................................................................ 5

    I.      THE COMPLAINT STATES A CLAIM UNDER THE CPO ............................... 5

           A.     The Complaint plausibly alleges the X and Grok apps are covered consumer goods and services. .................................................................... 6

                1.     X's social-media software products are covered consumer goods. ...................................................................................... 6

                2.     Grok is a covered consumer good. ................................................. 7

                3.     Alternatively, Grok's visual design services also constitute "subprofessional services." ............................................................. 8

           B.     The Complaint alleges actionable deceptive and unfair trade practices. ... 10

                1.     The Complaint's well-pleaded deception theory is actionable. .... 10

                       a.     Defendants' deceptive statements and omissions are actionable, material, and pleaded with particularity. ........ 10

                       b.     The City need not plead individualized reliance or compensable consumer loss. ............................................. 14

                       c.     Ms. Yaccarino's testimony supports but is not necessary to the City's claim. ........................................................... 15

                2.     The City's well-pleaded unfairness theory is independently actionable. ....................................................................................... 16

                3.     The CPO is constitutional as applied to the practices alleged. ..... 19

            C.     The challenged practices occurred in sales or offers for sale in Baltimore. ................................................................................................. 22

            D.     The CPO would not exceed the City's authority under Maryland law. .... 25

    II.      SECTION 230 DOES NOT BAR THE CITY'S CLAIMS ................................. 26

           A.     The City's deception and unfairness theories hold Defendants liable for their own conduct and expression as information content providers. ....... 26

           B.     Section 230(c)(2)(A) does not immunize the conduct challenged by the City. ......................................................................................................... 30

CONCLUSION .................................................................................................................... 30

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*180s, Inc. v. Gordini U.S.A., Inc.*,
   602 F. Supp. 2d 635 (D. Md. 2009)......................................................................15

*303 Creative LLC v. Elenis*,
   600 U.S. 570 (2023)...........................................................................................21

*Addi v. Corvias Mgmt.-Army, LLC*,
   2020 WL 5076170 (D. Md. Aug. 27, 2020) ..........................................................12

*Alexander v. Carrington Mortg. Servs., LLC*,
   23 F.4th 370 (4th Cir. 2022) ...............................................................................15

*Alexander v. United States*,
   509 U.S. 544 (1993).............................................................................................21

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).............................................................................................4

*Assanah-Carroll v. Law Offs. of Edward J. Maher, P.C.*,
   281 A.3d 72 (Md. 2022) ......................................................................................25

*Awah v. Wells Fargo Dealer Servs., Inc.*,
   2019 WL 410412 (Md. Ct. Spec. App. Jan. 31, 2019) ...........................................15

*Bogard v. TikTok Inc.*,
   2025 WL 3637035 (N.D. Cal. Dec. 15, 2025).......................................................29

*Bryant v. Koppers, Inc.*,
   627 F. Supp. 3d 466 (D. Md. 2022), *aff'd*, 2023 WL 3053017 (4th Cir. Apr.
   24, 2023) .......................................................................................................5, 13

*Cantrell v. Forest City Publ'g Co.*,
   419 U.S. 245 (1974).............................................................................................21

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
   447 U.S. 557 (1980).............................................................................................20

*Chemist Corner, Inc. v. Epic Pharm. Network, Inc.*,
   2019 WL 4750293 (D. Md. Sept. 30, 2019)…………………………………………….20

*Consumer Prot. Div. v. Morgan*,
   874 A.2d 919 (Md. 2005) .....................................................................................14

*Doe 1 v. Twitter, Inc.*,
   148 F.4th 635 (9th Cir. 2025) ............................................................................................29

*Doe v. Discord Inc.*,
   2026 WL 1067574 (N.D. Ohio Apr. 20, 2026).....................................................................29

*Doe v. Grindr Inc.*,
   128 F.4th 1148 (9th Cir. 2025) ......................................................................................12, 29

*Doe v. Internet Brands, Inc.*,
   824 F.3d 846 (9th Cir. 2016) ..............................................................................................29

*Doe v. X Corp.*,
   821 F. Supp. 3d 632 (N.D. Tex. 2026)………………………………………………….30

*Engage Armament LLC v. Montgomery Cnty.*,
   356 A.3d 79 (Md. 2026)……………………………………………………………………25

*Est. of Bride v. Yolo Techs., Inc.*,
   112 F.4th 1168 (9th Cir. 2024) ...........................................................................................29

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) ......................................................................................26, 28

*Force v. Facebook, Inc.*,
   934 F.3d 53 (2d Cir. 2019).................................................................................................26

*FTC v. Wyndham Worldwide Corp.*,
   799 F.3d 236 (3d Cir. 2015) …………………………………………………...…………19

*Garnitschnig v. Horovitz*,
   48 F. Supp. 3d 820 (D. Md. 2014) .......................................................................................5

*Goines v. Valley Cmty. Servs. Bd.*,
   822 F.3d 159 (4th Cir. 2016) ................................................................................................3

*Golt v. Phillips*,
   517 A.2d 328 (Md. 1986)………………………………………………………...…….16

*Green v. H & R Block, Inc.*,
   735 A.2d 1039 (Md. 1999) ...........................................................................................10, 13

*Henderson v. Source for Pub. Data, L.P.*,
   53 F.4th 110 (4th Cir. 2022) ......................................................................................2, 26, 27

*Hibdon v. Safeguard Props., LLC*,
   2015 WL 4249525 (D. Md. July 9, 2015)...........................................................................16

iii

*Jones v. Dirty World Ent. Recordings LLC*,
   755 F.3d 398 (6th Cir. 2014) ...............................................................................26

*Legg v. Castruccio*,
   642 A.2d 906 (Md. Ct. Spec. App. 1994) ...................................................16, 17, 18

*Lemma v. CalAtlantic Grp., Inc.*,
   643 F. Supp. 3d 564 (D. Md. 2022 ...........................................................................26

*Lemmon v. Snap, Inc.*,
   995 F.3d 1085 (9th Cir. 2021) ...............................................................................28

*Lloyd v. Gen. Motors Corp.*,
   916 A.2d 257 (Md. 2007) .................................................................................12, 14

*Lucas v. Moore Transport of Tulsa, LLC*,
   2018 WL 4052194 (D. Md. Aug. 24, 2018) ...........................................................14

*Luskin's, Inc. v. Consumer Prot. Div.*,
   726 A.2d 702 (Md. 1999) ...........................................................................11, 13, 26

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
   440 F. Supp. 3d 447 (D. Md. 2020) .........................................................................11

*McGraw v. Loyola Ford, Inc.*,
   723 A.2d 502 (Md. 1999)…………………………………………………………….12

*M.P. ex rel. Pinckney v. Meta Platforms, Inc.*,
   127 F.4th 516 (4th Cir. 2025) .................................................................................28

*Morris v. Osmose Wood Preserving*,
   667 A.2d 624 (Md. 1995)…………………………………………………………….24

*Reno v. ACLU*,
   521 U.S. 844 (1997).................................................................................................20

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
   753 F. Supp. 3d 849 (N.D. Cal. 2024) .............................................................. *passim*

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019)......................................................................................12

*Spaulding v. Wells Fargo Bank, N.A.*,
   714 F.3d 769 (4th Cir. 2013) ...............................................................................5, 22

*Sterling v. Ourisman Chevrolet of Bowie, Inc.*,
   2015 WL 2213708 (D. Md. May 8, 2015)...............................................................15

iv

*Suchin v. Fresenius Med. Care Holdings, Inc.*,
715 F. Supp. 3d 703 (D. Md. 2024) ...................................................................................7

*Wheeling v. Selene Fin. LP*,
250 A.3d 197 (Md. 2021) ...............................................................................................16

*Williams v. Lendmark Fin. Servs., Inc.*,
2014 WL 1255854 (D. Md. Mar. 25, 2014)……………………………………………….10

*Xia Bi v. McAuliffe*,
927 F.3d 177 (4th Cir. 2019) ........................................................................................14

*Zacchini v. Scripps-Howard Broad. Co.*,
433 U.S. 562 (1977)........................................................................................................21

**Statutes, Ordinances, and Rules**

Fed. R. Civ. P. 9(b) ................................................................................................5, 13, 14, 22

Fed. R. Civ. P. 12(b)(6) ..................................................................................................4, 15

15 U.S.C. § 45(n) ...................................................................................................16, 18, 19, 22

47 U.S.C. § 230(c)(2)(A) .....................................................................................................30

47 U.S.C. § 230(c)(1)............................................................................................... *passim*

47 U.S.C. § 230(f)(3) ....................................................................................................26, 28

Baltimore City Code art. 2, § 4-1 *et seq.* .................................................................. *passim*

Md. Code Ann., Com. Law §§ 13-101 *et seq.* ........................................................... *passim*

Md. Code Ann., Com. Law § 22-102(a) ...........................................................................6, 22

Md. Code Ann., Crim. Law § 3-809(a)(6), (c) ...................................................................18

Pub. L. No. 119-12, §§ 2–3, 139 Stat. 55, 55–61 (2025)..................................................19

**Other Authorities**

*Big Tech and the Online Child Sexual Exploitation Crisis: Hearing Before the Senate
Committee on the Judiciary*, S. Hrg. 118-497 (Jan. 31, 2024) ..................................15

Fed. Trade Comm'n, *A Look Behind the Screens,*
2024 WL 4272104 (Sept. 2024)....................................................................................23

*FTC Policy Statement on Deception*,
appended to *Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984) ....................................13

*FTC Policy Statement on Unfairness*,
    appended to *Int'l Harvester Co.*, 104 F.T.C. 949 (1984)...........................................................17

Merriam-Webster, Goods, https://www.merriam-webster.com/dictionary/goods
    (last visited July 29, 2026) .............................................................................................6

X.AI, *Grok for Business*,
    https://web.archive.org/web/20260501070504/https://x.ai/grok/business
    (archived URL dated May 1, 2026) ...................................................................................8

X.AI, *Terms of Service – Consumer* (effective Nov. 4, 2025),
    https://web.archive.org/web/20260301202320/https://x.ai/legal/terms-of-
    service (archived URL dated Mar. 1, 2026) ....................................................................8

X, *About X Premium*,
    https://web.archive.org/web/20250802173109/https://help.x.com/en/using-
    x/x-premium (archived URL dated August 2, 2025) .....................................................8

X, *About X Premium*,
    https://web.archive.org/web/20260301091219/https://help.x.com/en/using-
    x/x-premium (archived URL dated Mar. 1, 2026) ...................................................8, 23

X, *Terms of Service* (effective Jan. 15, 2026),
    https://web.archive.org/web/20260301085831/https://x.com/en/tos (archived
    URL dated Mar. 1, 2026) ............................................................................................7, 8

X, *The X Rules*, https://web.archive.org/web/20260404075058/https://help.x.com/en/rules-and-
    policies/x-rules (archived URL dated Apr. 4, 2026) ....................................................12

**INTRODUCTION**

This case is about companies that promised to prohibit nonconsensual sexual deepfakes, then produced them for profit. Defendants X Corp., X.AI Corp., and X.AI LLC told consumers that sexualized deepfakes were "strictly prohibited" on the social media platform X and generative AI chatbot Grok. They embedded that promise in the contractual terms and incorporated policies governing the products. Then they violated it—creating millions of deepfakes through Grok and publishing them, on Grok's own X account, in a torrent of harassment. *See* Compl. ¶¶ 100–102.

Defendants say you can't fault a police chief for failing to prevent all crime. But their analogy is inapt because in this instance, it is the "police chief" who is committing the crimes. Defendants blame their users. But users didn't generate these images. Users asked for nudes and Defendants answered—generating sexualized images of real, nonconsenting people, including children.

Defendants' arguments all fail for the same reason. They face liability for their own deceptive speech and unfair practices, not for failing to moderate user-generated content. Baltimore alleges Defendants violated the Consumer Protection Ordinance ("CPO") under two independent theories of liability. *First*, Defendants engaged in deceptive practices by offering X and Grok apps for sale in Baltimore under the false claim that these products and platforms banned abusive deepfakes—when in fact Defendants used them to create and publish deepfakes. *Id.* ¶¶ 61–90, 100–102, 113(c)–(d), (f). Defendants' product-design and monetization practices were independently unfair, causing substantial, unavoidable consumer injury without countervailing benefit. *Id.* ¶¶ 92–107, 113(a)–(b), (e), (g)–(h).

Section 230 does not bar these theories. The City's deception theories arise entirely from Defendants' own expression and conduct—not from user-generated content. Defendants inserted

false promises into their own User Agreements. Their chatbot Grok generated visual, sexualized outputs—"undressing" victims without their knowledge or consent. And those outputs prove the falsity of Defendants' rules and assurances. Likewise, the City's unfairness theory challenges Defendants' conduct as product designers and merchants: the design, lacking safeguards, and monetization that materially contributed to deepfakes. Defendants made the representations—and the abusive deepfakes that rendered them false—and enjoy no immunity for the content they created in whole or in part. *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 122–29 (4th Cir. 2022).

Defendants' remaining arguments—that Grok is not a covered "service," that the challenged conduct did not occur "in" a Baltimore sale, and that the CPO cannot reach Defendants' nationwide conduct—fare no better, for the reasons explained below. Because the Complaint plausibly alleges covered consumer contracts, actionable deception and unfairness occurring in Baltimore, and claims outside Section 230's immunity, the motion should be denied.

## BACKGROUND

Grok is a generative artificial-intelligence product developed and operated by Defendants and distributed to consumers through the X web and mobile apps and the standalone Grok web and mobile apps. *See, e.g.*, Compl. ¶¶ 1, 3, 32–34. Grok provides visual art design and copywriting services to its users—a synthetic substitute for graphic designers or copywriters. *Id.* ¶¶ 3, 34–44. Grok does not host or publish third-party generated content; it generates and publishes content on behalf of third parties, drawing on training data that includes scraped online material, images, and text. *Id.* With minimal prompting, Grok reproduces the identifiable features of real people— including women and children—and places them in sexually explicit, degrading, or violent scenarios. *Id.*

2

Defendants expanded Grok's image capabilities in 2025 through features including Grok Imagine, "Spicy Mode," and image editing. *Id.* ¶¶ 33, 45. By early January 2026, Grok was generating and distributing sexualized images of women and girls widely across X. *Id.* ¶ 47. Musk publicly joined and promoted that functionality by sharing a Grok-generated image of himself in a bikini, and an image of a woman's undressed body on top of a SpaceX rocket, commenting "Perfect," and reacting to other users' commentary with laughing emojis. *Id.* ¶¶ 48–50.

One analysis estimated that Grok sexualized more than three million images over approximately eleven days, including roughly 23,000 depicting children; another estimated approximately 1.8 million sexualized images of real people during substantially the same period. *Id.* ¶¶ 51–53. Defendants deploy Grok on X through a dedicated tab and the @Grok account, which users can tag in posts to prompt Grok to generate images, and Grok routinely posts the resulting images to X's public media feed by default, facilitating their rapid dissemination. *Id.* ¶¶ 29, 36–37, 97. Images generated through the standalone Grok app and website could also be downloaded and redistributed across external forums, channels, and websites. *Id.* ¶¶ 42–43.

At the same time, Defendants represented in the terms, rules, and policies that form their licensing agreements with consumers (collectively, the "Terms and Policies")[1] that X and Grok prohibited nonconsensual intimate imagery, harmful manipulated media, pornographic depictions of real people, and the sexual exploitation of children. *Id.* ¶¶ 66–78. They also represented that Spicy Mode did not support uploads of real photographs, safeguards existed to prevent nonconsensual sexual deepfakes, and reported failures were "isolated cases." *Id.* ¶¶ 76, 80. Each

---

[1] The Complaint identifies X as the social-media platform through which Grok is distributed and accessed. *See* Compl. ¶¶ 1 n.1, 3, 32, 34, 36–37. It also expressly alleges that Defendants' terms of service, platform rules, and acceptable-use policies governed use of X and Grok and contained the challenged representations. *Id.* ¶¶ 61, 66–78. Those materials include X's Terms of Service and X Rules, as well as X.AI's Acceptable Use Policy. *Id.* ¶¶ 66–75 nn.19–24. Because the Complaint expressly relies on those materials, and they are integral to the City's claims, the Court may consider them at the pleading stage. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

of those statements was misleading. Defendants themselves generated the prohibited imagery and then uploaded and published them. Defendants designed Grok's safeguards to be weak or easily circumvented. And Defendants concealed those known limitations. *Id.* ¶¶ 63–66, 72, 77, 79.

After acknowledging "lapses in safeguards," Defendants allegedly restricted certain image features on X to paying subscribers but left similar functionality available through other Grok interfaces. *Id.* ¶¶ 54–60, 80–84. Defendants thus continued offering and monetizing the functionality despite notice of the harm. *Id.* ¶¶ 56–60, 81–84.

Baltimore residents face the risk of being "undressed" by Grok whether or not they use it or X. Another person could select an existing photograph from X or the internet or upload one to Grok and direct Grok to manipulate it without the depicted person's knowledge or participation. *Id.* ¶¶ 35–44, 93–106. Anyone can be a victim of this technology, including undersigned counsel, court personnel, and Baltimore's officials. The alleged injuries include invasions of privacy, dignity, and bodily autonomy, emotional and psychological harm, and the continuing loss of control caused by copying and redistribution. *Id.* ¶¶ 104–06.

The City asserts one CPO claim based on two independently actionable theories of liability: (1) deceptive practices, based on Defendants' affirmative misrepresentations and material omissions in their marketing, public statements, and Terms and Policies, and (2) unfair trade practices, based on Defendants' design, distribution, and monetization of Grok.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must allege sufficient facts, accepted as true, to permit a "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). The Court must construe those facts and all reasonable inferences in the City's favor and may not resolve factual disputes, weigh evidence, or

accept Defendants' competing characterization of the allegations. *See Garnitschnig v. Horovitz*, 48 F. Supp. 3d 820, 828 (D. Md. 2014).

The City's unfairness theory—which sounds not in fraud, but in product-design, distribution, and monetization—is subject to the ordinary *Iqbal* standard. *See Bryant v. Koppers, Inc.*, 627 F. Supp. 3d 466, 478 (D. Md. 2022), *aff'd*, 2023 WL 3053017 (4th Cir. Apr. 24, 2023) (recognizing that an unfair-practices claim under § 13-303 need not replicate common-law fraud, "obviating the need for heightened pleading at the dismissal stage."). The City's deceptive-practices theory "sounds in fraud" and "is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b), which requires a plaintiff to plead 'with particularity the circumstances constituting fraud.'" *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013).

## ARGUMENT

## I.     THE COMPLAINT STATES A CLAIM UNDER THE CPO

"In Baltimore City, a person may not engage in any unfair, abusive, or deceptive trade practice" in the "sale" or "offer for sale" of any "(i) consumer good; (ii) consumer realty; or (iii) consumer service." Baltimore City Code art. 2, § 4-2 ("CPO"). The CPO authorizes the City Solicitor to seek civil penalties and injunctive relief. *Id.* §§ 4-3, 4-5. The MCPA, Md. Code Ann., Com. Law §§ 13-101 *et seq.*, establishes minimum statewide consumer protections and directs courts to construe its provisions liberally to promote their remedial purpose. *Id.* §§ 13-102(b)(1), (3), 13-105. To state claims under the CPO, the City must plausibly allege that (i) X and Grok are consumer goods and services, (ii) that Defendants engaged in deceptive or unfair trade practices, and (iii) the practices occurred in the sale or offer for sale of X and Grok in Baltimore.

**A.**    **The Complaint plausibly alleges the X and Grok apps are covered consumer goods and services.**

The CPO defines its terms by reference to the MCPA, incorporating that statute's scope. CPO § 4-1.

**1.    X's social-media software products are covered consumer goods.**

"Consumer goods" are goods "primarily for personal, household, family, or agricultural purposes." MCPA § 13-101(d)(1). "Goods" is undefined but its ordinary meaning is "something that has economic utility or satisfies an economic want."[2] A "consumer" includes a "licensee or recipient of computer information or computer programs under a consumer contract," MCPA § 13-101(c)(2)(ii), and a "consumer contract," in turn, is defined as "a contract between a merchant licensor and a consumer." Md. Code Ann., Com. Law § 22-102(a)(16).

"Computer information" means "information in electronic form which is obtained from or through the use of a computer or which is in a form capable of being processed by a computer." *Id.* § 22-102(a)(10). A "[c]omputer program" is "a set of statements or instructions to be used directly or indirectly in a computer to bring about a certain result." *Id.* § 22-102(a)(12). A "sale" includes any "offer or attempt to sell . . . intangibles for cash or credit." MCPA § 13-101(i)(1).

Defendants marketed, distributed, and sold subscriptions to X's web-based and mobile software applications—including the Grok AI chatbot—to Baltimore consumers. *See* Compl. ¶¶ 14–17, 29, 32, 34, 54–57. These software products meet every statutory element: they are computer information or programs licensed to consumers primarily for personal use.

X's mobile application is a computer program, and both the applications and web-based platform provide "computer information" in electronic form: text, video, and images.[3] X's own

---

[2] *See* Merriam-Webster, Goods, https://www.merriam-webster.com/dictionary/goods (last visited July 29, 2026).
[3] *See* X, https://x.com.

terms state: "[W]e provide you a license to use the software we provide . . . such as the X mobile application."[4]

X licenses these programs through its "Terms of Service," which it characterizes as a "legally binding contract" between itself and its users.[5] The license is expressly for "personal" use: "We give you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services."[6] X restricts commercial uses, prohibiting the software from being "sold" to others. X also offers consumers a paid subscription—"X Premium"—that includes higher usage limits and enhanced functionality, in exchange for a monthly fee. *See* Compl. ¶¶ 54–57.

Defendants do not dispute that X's apps are consumer goods under the CPO. Instead, they claim the City did not allege these apps are goods. Untrue. The Complaint repeatedly alleges that Defendants designed, marketed, and sold their software, including Grok, and commercialized Grok as a consumer software product and challenges Grok's product design and functionality across the X platform and standalone Grok applications. *Id.* ¶¶ 1, 4, 9, 65, 107, 113(a), (d)–(e). Those allegations plausibly establish that Grok is a consumer good, and Defendants waived any argument otherwise. *Suchin v. Fresenius Med. Care Holdings, Inc.*, 715 F. Supp. 3d 703, 711 (D. Md. 2024) ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered.").

### 2.    Grok is a covered consumer good.

The Complaint also alleges Defendants designed, marketed, and sold the Grok AI chatbot as a consumer good. *See* Compl. ¶¶ 4, 9, 65, 113(d)–(e). Grok is a computer program: X's Terms

---

[4] X, *Terms of Service* (effective Jan. 15, 2026), https://web.archive.org/web/20260301085831/https://x.com/en/tos (archived URL dated Mar. 1, 2026).
[5] *Id.*
[6] *Id.*

of Service characterize it as "software." It provides computer information in the form of text and images. *Id.* ¶¶ 1, 34, 42. And Defendants themselves concede Grok is "an AI image-generation tool," Mot. at 7—a tool is a "good" within the term's ordinary meaning.

When consumers access Grok through X, their use is governed by X's Terms of Service. *See* Compl. ¶¶ 34, 36–37, 67, 78; X.AI Terms of Service – Consumer ("To access Grok on X, you must agree to the X Terms of Service.").[7] X offers for sale a premium subscription that grants users "increased usage limits on Grok." *See* Compl. ¶¶ 54–57.[8] Defendants X.AI Corporation and X.AI LLC also license the Grok tool—both its web-based and mobile apps—through the X.AI "Terms of Service – Consumer."[9] These computer programs are offered for sale through paid subscriptions.[10] And this X.AI contract limits access to personal use, as a "consumer" contract, distinct from Grok's Business and Enterprise offerings.[11]

The City has thus plausibly alleged that Grok is a consumer good subject to a consumer contract and covered by the CPO/MCPA.

### 3. Alternatively, Grok's visual design services also constitute "subprofessional services."

The MCPA defines "service" as "any" "(1) building repair or improvement service; (2) subprofessional service; (3) repair of a motor vehicle, home appliance, or other similar commodity; or (4) repair, installation, or other servicing of any plumbing, heating, electrical, or mechanical

---

[7]     X.AI, *Terms of Service – Consumer* (effective Nov. 4, 2025), https://web.archive.org/web/20260301202320/https://x.ai/legal/terms-of-service (archived URL dated Mar. 1, 2026) ("By choosing to log in to our Service by using . . . X . . .").

[8] *See also* X, *About X Premium*, https://web.archive.org/web/20260301091219/https://help.x.com/en/using-x/x-premium (archived URL dated Mar. 1, 2026). X's website offered paid premium access to Grok long before January 8, 2026, as Defendants claim. *Compare* Mot. at 21, *with* X, *About X Premium*, https://web.archive.org/web/20250802173109/https://help.x.com/en/using-x/x-premium (archived URL dated August 2, 2025).

[9] X.AI, *Terms of Service – Consumer, supra* note 7.

[10] *Id.*

[11]     *See* X.AI, *Grok for Business*, https://web.archive.org/web/20260501070504/https://x.ai/grok/business (archived URL dated May 1, 2026).

device." MCPA § 13-101(j). The statute "shall be construed and applied liberally to promote its purpose." *Id.* § 13-105.

Defendants offer Baltimore consumers visual-design generation and publication services through Grok. *See* Compl. ¶¶ 14–17, 29, 34–44, 97. These "image-generation" services, Mot. at 6, constitute "subprofessional services" under MCPA § 13-101(j)(2).

The MCPA expressly applies to a "publisher" or "printer" who "engages in an unfair or deceptive trade practice in the sale of its own goods or services." § 13-104(3).[12] MCPA § 13-101, amended in 2000, extends this protection to online publishers and computer information transactions. Since publishing services fit no other § 13-101(j) category, they must be "subprofessional services." The MCPA thus applies to Defendants, who all generate and publish Grok-generated content through Grok and X on their respective apps and platforms. "Newspaper[s]" and "magazine[s]" routinely produce and disseminate visual designs. Defendants have simply automated the process through generative AI. This is twenty-first century publishing, squarely regulated by the MCPA and CPO.

Defendants claim "subprofessional services" are limited to certain "discrete categories of service." Mot. at 6–7. But they fail to identify those categories. At a minimum, MCPA § 13-104(3) makes clear they include generating and publishing images.

Finally, MCPA § 13-104 refutes Defendants' *noscitur a sociis* argument that "subprofessional services" must be analogous to property-repair services in other § 13-101(j) categories. Defendants' reading would make § 13-104 superfluous: a "lawyer," "Christian Science practitioner," or "publisher" would already be exempt, since none repair property. Besides,

---

[12] Section 13-104(3) provides that unfair or deceptive trade practices in the sale of publishing services or goods are covered by the MCPA, but that publishers are only liable for distributing third-party advertisements if they are aware they violate the statute.

Maryland courts extend the MCPA beyond repairs, to tax-preparers, for example. *See, e.g.*, *Green v. H & R Block, Inc.*, 735 A.2d 1039, 1058–59 (Md. 1999).[13]

The City has thus plausibly alleged that the X and Grok apps are consumer goods—specifically computer programs and information subject to consumer contracts—through which Defendants offer consumer services—image generation and publishing. All are regulated by the CPO.[14]

### B.      The Complaint alleges actionable deceptive and unfair trade practices.

#### 1.      The Complaint's well-pleaded deception theory is actionable.

##### a.      Defendants' deceptive statements and omissions are actionable, material, and pleaded with particularity.

Defendants mischaracterize the City's deception theory. The City does not allege Defendants "failed to sufficiently enforce" a "zero-tolerance policy regarding sexually exploitative images" against rogue users. Mot. at 9–12. No, the City alleges Defendants *themselves* violated that proclaimed zero-tolerance policy. Defendants' User Agreements claimed they prohibited nonconsensual deepfakes, Compl. ¶¶ 66–71, 74–76, 79. But then they themselves generated them. *Id.* ¶¶ 33–44, 77.

This case is about Defendants' deceptive statements and refusal to moderate their own content —not their users'. Grok allegedly generated and publicly distributed the very content

---

[13] The CPO's separate coverage of "educational services" is not superfluous. *Contra* Mot. at 7–8 (citing CPO § 4-2(3)). For one thing, it clarifies that professionals who provide educational services—*e.g.*, doctors or lawyers—are regulated by the CPO even if they would be exempt for other services under MCPA § 13-104.

[14] Defendants' authorities do not establish otherwise. *Chemist Corner, Inc. v. Epic Pharm. Network, Inc.*, Mot. at 8, involved a commercial dispute between independent pharmacies and a behind-the-scenes pharmacy-services administrator. 2019 WL 4750293, at *1–3 (D. Md. Sept. 30, 2019). The administrator had only a tangential connection to consumer transactions, made no representations to consumers, and was not alleged to have deceived them. *Id.* at *3. Here, Defendants directly marketed and provided Grok to consumers, made the challenged representations to them, and sold access to its functionality. *Williams v. Lendmark Fin. Servs., Inc.*, Mot. at 8, construed a different statute governing late fees and held that incidental credit-insurance products and financing charges did not transform a promissory note into a contract for goods or services. 2014 WL 1255854, at *3–6 (D. Md. Mar. 25, 2014). The X and Grok apps are not an incidental charge appended to an otherwise uncovered transaction. They are what Defendants marketed, offered, and sold.

10

Defendants represented that it prohibited, and Defendants continued to market and monetize that functionality after learning that it was producing such content at scale. Compl. ¶¶ 51–60, 77–87, 100–02.

Those allegations plead affirmative deception. A corporation claiming it has a "zero tolerance" policy while simultaneously violating said policy millions of times is exactly the kind of affirmative "false" or "misleading" statement the CPO proscribes because it "has the capacity, tendency, or effect of deceiving or misleading consumers." MCPA § 13-301(1). Defendants represented that Spicy Mode did not support uploading photographs of real people; that nonconsensual deepfakes were "[s]trictly [p]rohibited"; that Grok remained subject to "core safety policies"; and that sexualized images of minors were merely "isolated cases." Compl. ¶¶ 69–71, 73, 75–76, 78, 80. None of these statements were true.

The alleged omissions reinforce that affirmative contradiction. Defendants failed to disclose that Grok could sexualize photographs of real people with minimal prompting, they did not honor its own (readily circumvented) safeguards, and substantially similar functionality remained available through other Grok interfaces. *Id.* ¶¶ 63–65, 72, 74, 77, 83–90. Maryland law evaluates the overall impression created by the challenged representations and accompanying omissions; literal truth viewed in isolation is not dispositive. *See Luskin's, Inc. v. Consumer Prot. Div.*, 726 A.2d 702, 708–09, 716–17 (Md. 1999) (holding an advertisement was deceptive where undisclosed conditions materially qualified an offer). Consistent with that principle, courts have sustained MCPA claims where a business's actual practices allegedly contradicted its stated safeguards or service commitments. *See, e.g., In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 483–84, 489–90 (D. Md. 2020) (denying dismissal of an MCPA claim alleging material representations and omissions concerning data security where privacy statements

11

promised reasonable safeguards that defendants allegedly failed to provide); *Addi v. Corvias Mgmt.-Army, LLC*, 2020 WL 5076170, at *34–35 (D. Md. Aug. 27, 2020) (denying dismissal of an MCPA claim alleging that defendants represented that housing was well maintained, inspected, and subject to prompt repairs, while knowing that the homes had not been properly maintained and routinely failing to provide the promised maintenance); *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 283–84 (Md. 2007) (denying dismissal of an MCPA claim alleging a known safety defect, continued sales, and concealment).

Defendants cannot disclaim their own Terms and Policies as "puffery." Mot. at 11–12. The rule prohibiting "abusive content" [15] is a "legally binding" contractual commitment, not sales talk.[16] Statements about technical design—whether Grok supports real-photo uploads, whether restrictions barred specific outputs—were verifiable, specific statements about product features, not breezy exaggerations. *See, e.g.*, Compl. ¶¶ 69–71, 73–76, 78, 80. Courts do not treat platform-safety statements as puffery when considered as part of an alleged course of deception concerning objective safety risks. *See, e.g.*, *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.* ("*In re Social Media*"), 753 F. Supp. 3d 849, 891 (N.D. Cal. 2024). Here, the specific representations and omissions collectively conveyed that X and Grok were subject to effective restrictions against the very outputs Grok generated and distributed at massive scale.[17]

---

[15] X, *The X Rules*, https://web.archive.org/web/20260404075058/https://help.x.com/en/rules-and-policies/x-rules (archived URL dated Apr. 4, 2026).

[16] X, *Terms of Service*, *supra* note 4.

[17] Defendants' authorities involve statements that are materially different from those alleged here. *McGraw v. Loyola Ford, Inc.*, Mot. at 11, concerned subjective sales talk that a vehicle was the "most outstanding value" and offered at the "lowest" possible price. 723 A.2d 502, 513 (Md. 1999). *Doe v. Grindr Inc.*, Mot. at 10, addressed a generalized statement that an application was designed to provide a "safe and secure environment," not specific assertions about existing technical capabilities or safeguards. 128 F.4th 1148, 1154 (9th Cir. 2025). And *Singh v. Cigna Corp.*, Mot. at 11, involved general descriptions of compliance efforts that were expressly qualified by acknowledgments of regulatory complexity and ongoing work. 918 F.3d 57, 63–64 (2d Cir. 2019). As alleged, Defendants made concrete statements about what Grok supported, what its restrictions prevented, and the scale of known safeguard failures. Their acknowledgment that improvements were "ongoing" does not negate those statements, particularly where the same communication allegedly characterized widespread failures as isolated. Compl. ¶ 80.

The Complaint also plausibly alleges materiality. Information is material when it is important to consumers and likely to affect their choice or conduct. *Luskin's*, 726 A.2d at 713–14. For an omission under § 13-301(3), the question is whether "a significant number of unsophisticated consumers would find that information important in determining a course of action." *Green*, 735 A.2d at 1059.[18] Moreover, materiality is ordinarily a fact question, not a matter of law. *Id.*

Defendants wrongly limit inquiry to whether a particular Baltimore consumer would have declined to pay for Grok. Mot. at 12–13. But the question is broader: would Baltimore consumers have accepted the X or Grok User Agreements; used the tools and platforms; uploaded photographs—at the risk of having them be "undressed"; allowed children access, or purchased premium functionality had they known that Defendants' safety rules and contractual commitments were a sham? Compl. ¶ 61. That is a jury question. Further, information concerning a product's central functionality and safety is presumptively material. *FTC Policy Statement on Deception*, appended to *Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 182 (1984); *see* MCPA § 13-105 (requiring statute be read to harmonize with FTC interpretations).

Finally, the Complaint satisfies Rule 9(b). It identifies the speakers, the challenged statements and omissions, and why they were misleading. *See, e.g.*, Compl. ¶¶ 61–90. It identifies *when* they were made—including the Terms and Policies that remained operative and were presented to users during the relevant period. *Id.* ¶¶ 61, 67, 78. Unlike *Bryant*, Mot. at 21, this Complaint is not "devoid" of allegations concerning the who, what, when of the alleged deception.

---

[18] A consumer may be both reasonable and "unsophisticated;" the latter term concerns the consumer's lack of specialized expertise, not irrationality. *Luskin's*, 726 A.2d at 713.

627 F. Supp. 3d at 478 (D. Md. 2022). Rule 9(b) requires particularity, not proof, and any inferences the City asks the Court to draw are reasonable. *Contra* Mot. at 13.[19]

### b.    The City need not plead individualized reliance or compensable consumer loss.

Defendants wrongly import MCPA private-action standards into public CPO enforcement. Mot. at 13–14. The CPO defines prohibited practices and authorizes penalties and injunctive relief "for a violation," without requiring proof of individual reliance or loss. CPO §§ 4–2, 4–3, 4–5(d). Its incorporated definitions target the practice itself: § 13-301(1) reaches representations having the "capacity, tendency, or effect" of deceiving consumers; § 13–301(3) reaches omissions that deceive or "tend[] to deceive"; and § 13–301(9) requires only that Defendants intend consumers to rely, not that they actually do.

Although the CPO does not expressly incorporate MCPA § 13-302 (which explicitly states no reliance or damage is required), that omission does not *add* reliance and injury elements, which are found nowhere in the text of the CPO. *Contra* Mot. at 13. Instead, the CPO defines misconduct and creates public remedies.

Maryland precedent confirms that public enforcement, unlike a private damages action, does not require actual loss because it is designed to prevent prohibited practices "even before any consumer is injured." *Lloyd*, 916 A.2d at 280–81. Reliance is also unnecessary in public enforcement actions; it only matters for restitution to a particular customer. *Consumer Prot. Div. v. Morgan*, 874 A.2d 919, 941–43 (Md. 2005).

---

[19] *Lucas v. Moore Transport of Tulsa, LLC*, 2018 WL 4052194, at *2 (D. Md. Aug. 24, 2018), Mot. at 13, merely states that courts need not accept unwarranted inferences; it did not address materiality. The inference here—that consumers care whether an AI product can transform photographs of themselves or their children into sexual imagery—is plainly warranted. Defendants' repeated invocation of *Xia Bi v. McAuliffe*, 927 F.3d 177 (4th Cir. 2019), does not change this conclusion. Mot. at 5, 11, 20–21. *Xia Bi* confirms only that reliance-related "circumstances constituting fraud" must be pleaded with particularity under Rule 9(b); it does not hold that a public enforcement action under a consumer-protection ordinance requires the same individualized-reliance particularity as a private fraud claim.

14

In any event, the Complaint alleges that the challenged practices affected consumer use and purchasing decisions and exposed Baltimore consumers to concrete privacy, dignitary, emotional, and psychological harms. *See* Compl. ¶¶ 96–106. Defendants' demand for a named Baltimore consumer who complained, unsubscribed, or admitted being "duped," Mot. at 14, imposes a burden that is not imposed by either the CPO or the MCPA.[20]

### c. Ms. Yaccarino's testimony supports but is not necessary to the City's claim.

Defendants' *Noerr-Pennington* challenge is misplaced. Mot. at 14–16. *First*, the doctrine only protects activity undertaken "to petition the government" for redress. *180s, Inc. v. Gordini U.S.A., Inc.*, 602 F. Supp. 2d 635, 640 (D. Md. 2009). It presupposes a petitioner voluntarily sought a policy outcome. Yet Ms. Yaccarino was compelled to testify pursuant to a congressional subpoena.[21] Defendants cite no authority that compelled speech is shielded by *Noerr-Pennington*, nor do they identify what Ms. Yaccarino petitioned for. *In re Social Media* rejected the same categorical argument where Meta failed to show congressional statements sought governmental redress. 753 F. Supp. 3d at 894–95.

*Second*, even if the doctrine applied to Yaccarino's compelled testimony, those statements play a marginal role in the Complaint: it rests on Defendants' commercial speech in their User Agreements and product descriptions. Compl. ¶¶ 62–72, 74–90. The deception theory therefore survives even if the testimony is disregarded, which it should not be.[22]

---

[20] Defendants' cited authorities involved private MCPA plaintiffs seeking personal relief, not a government enforcer seeking statutory penalties and an injunction. *See* Mot. at 13–14 (citing *Alexander v. Carrington Mortg. Servs., LLC*, 23 F.4th 370, 380 (4th Cir. 2022); *Sterling v. Ourisman Chevrolet of Bowie, Inc.*, 2015 WL 2213708, at *7 (D. Md. May 8, 2015); *Awah v. Wells Fargo Dealer Servs., Inc.*, 2019 WL 410412, at *2 n.2 (Md. Ct. Spec. App. Jan. 31, 2019)).

[21] *Big Tech and the Online Child Sexual Exploitation Crisis: Hearing Before the Senate Committee on the Judiciary*, S. Hrg. 118-497 (Jan. 31, 2024).

[22] Whether the timing of the testimony affects its relevance is an evidentiary issue not properly raised in a 12(b)(6) motion. *See* Mot. at 15–16.

15

**2.    The City's well-pleaded unfairness theory is independently actionable.**

An unfair practice is actionable where it causes or is likely to cause substantial consumer injury that consumers cannot reasonably avoid and that is not outweighed by countervailing benefits to consumers or competition. *Legg v. Castruccio*, 642 A.2d 906, 916 (Md. Ct. Spec. App. 1994); 15 U.S.C. § 45(n).[23] The Complaint plausibly satisfies that standard.

*First*, the Complaint identifies a trade practice—not merely Grok's existence "in the marketplace." *Contra* Mot. at 16. It challenges Defendants' designing, marketing, distributing, and monetizing Grok while claiming to prohibit the content Grok generates and omitting material facts. *See, e.g.*, Compl. ¶¶ 8 ("In spite of these [alleged misrepresentations], X is now one of the largest distributors of NCII and CSAM." (citation modified)),[24] 60 ("Defendants prioritized revenue generation and user engagement over consumer protection, public safety, and compliance with their own stated rules and policies.").

The unfair trade practice alleged in the Complaint sprang from Defendants' own "operating policy or customary practice," not from isolated incidents of negligence or third-party misconduct. *Hibdon v. Safeguard Props., LLC,* 2015 WL 4249525, at *7 (D. Md. July 9, 2015). The alleged practices flow directly from Defendants' product design, Terms and Policies, and commercial decisions—not an aberrational act by a rogue employee or user.

Defendants are wrong that the City must fit these practices within § 13-301's enumerated categories. *Contra* Mot. at 17. To the contrary, Section 13-301 "provides a nonexclusive list."[25] And *Legg* recognized an independently actionable unfairness theory under the MCPA by adopting

---

[23] Although *Legg* involved a private MCPA action and reserved whether its adoption of the FTC framework "necessarily extend[ed] to public enforcement by the Division," *Legg*, 642 A.2d at 917 n.5, the Complaint satisfies that framework in any event.

[24] "NCII" refers to Non-Consensual Intimate Images; "CSAM" refers to Child Sexual Abuse Material.

[25] *Wheeling v. Selene Fin. LP*, 250 A.3d 197, 216 (Md. 2021) (citing *Golt v. Phillips*, 517 A.2d 328 (Md. 1986)).

the FTC's consumer-unfairness test as "the appropriate test for Maryland." 642 A.2d at 914, 917–18.

*Second*, the Complaint plausibly alleges substantial injury. Defendants downplay the harm as "fear, distress, and anxiety," arguing it is insufficient. Mot. at 17–18. But *Legg* recognizes that "unwarranted health and safety risks may also support a finding of unfairness." 642 A.2d at 916 (citation modified). FTC guidance also recognizes substantial injury where a practice causes smaller harms to many consumers or creates a significant risk of concrete harm. *FTC Policy Statement on Unfairness*, appended to *Int'l Harvester Co.*, 104 F.T.C. 949, 1070 (1984).

The Complaint alleges image-based sexual abuse of nonconsenting people, including children, resulting in privacy, dignity, and bodily autonomy harms; loss of control over likeness and sexual expression; and serious psychological harm aggravated by the difficulty of containing the spread of copied images. Compl. ¶¶ 96–106. The scale of these harms was enormous, with millions of deepfakes, and exposed every Baltimore resident to an unwarranted risk of substantial injury. *Id.* ¶¶ 51–53, 97, 100–05.

Those allegations support both widespread injury and a significant risk of concrete harm. For example, in *In re Social Media,* the court held that Meta's platform design and deployment met every applicable state unfairness standard by exploiting minors' vulnerabilities to maximize engagement and advertising revenue: "Even where not monetary, an act or practice can cause 'substantial injury' by doing a small harm to a large number of people, or if it raises a significant risk of concrete harm." 753 F. Supp. 3d at 895–96, 899.

*Third*, the injury was not reasonably avoidable. Reasonable avoidability asks whether the challenged practice "unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decision making." *Legg,* 642 A.2d at 916 (citation modified). Many people exposed to

17

the challenged risks made no marketplace choice at all: a victim need not use Grok, subscribe to X Premium, or maintain an X account. Another user may select or upload the victim's photograph and direct Grok to manipulate it without the victim's knowledge or participation. Compl. ¶¶ 35–44, 92–97. Consumers cannot avoid the injury by declining to purchase or use Defendants' product.

*Fourth*, benefits do not outweigh harms. While Defendants assert that generative AI generally benefits Marylanders, Mot. at 18, they do not articulate the social utility of a chatbot that "undresses" children and why that purported benefit outweighs obvious harms. The question is whether the specific challenged practice is "injurious in its net effect." *Legg*, 642 A.2d at 916 (citation modified). The Complaint alleges other AI developers were able to provide comparable chatbots with adequate safeguards—showing the legitimate benefits of generative AI did not require the design choices challenged here. *See* Compl. ¶¶ 89-90; *In re Social Media*, 753 F. Supp. 3d at 898–99 (declining to resolve the balance on the pleadings where less harmful alternatives were alleged).[26]

*Finally*, Defendants are wrong that the City must allege a violation of a specific public policy as an element of their unfairness theory.[27] Under Section 5(n) of the Federal Trade Commission Act, public policy may inform the unfairness analysis but "may not serve as a primary basis" for liability. 15 U.S.C. § 45(n).

In any event, formal and widely shared public policy directly addresses the conduct alleged. Maryland law expressly includes a computer-generated image within the "visual representation[s]" covered by its prohibition against specified nonconsensual distributions of intimate imagery. Md.

---

[26] The executive order cited by Defendants, Mot. at 18, does not suggest otherwise. A general executive policy favoring minimally burdensome AI regulation neither endorses the conduct alleged nor establishes that its benefits outweigh its harms.

[27] Contrary to Defendants' characterization, the Complaint does not "admit[]" that an established public-policy violation is an independent element; it correctly alleges that public policy is one consideration informing unfairness. *Compare* Mot. at 17, *with* Compl. ¶ 111.

Code Ann., Crim. Law § 3-809(a)(6), (c). Congress likewise enacted the TAKE IT DOWN Act, which expressly addresses digitally fabricated intimate depictions created using artificial intelligence and requires covered platforms to establish a notice-and-removal process for nonconsensual intimate imagery. Pub. L. No. 119-12, §§ 2–3, 139 Stat. 55, 55–61 (2025). These enactments refute Defendants' contention that the novelty of generative AI leaves no established public policy concerning AI-generated sexual imagery.

The Complaint therefore identifies Defendants' own repeated commercial practices and plausibly alleges substantial injury that consumers could not reasonably avoid and that was not outweighed by countervailing benefits.

### 3.   The CPO is constitutional as applied to the practices alleged.

The CPO's prohibition against unfair trade practices provides constitutionally adequate notice and meaningful standards for enforcement, including as applied here. The ordinance does not impose liability whenever the City retrospectively concludes that commercial conduct had unspecified "negative consequences." *Contra* Mot. at 19. And although Defendants invoke possible imprisonment, the cited misdemeanor provision authorizes a fine, not incarceration. CPO § 4-4.

Even assuming the more exacting vagueness standard applicable to penal provisions, the CPO incorporates an objective unfairness standard developed through state and federal precedent, providing fair notice and limiting enforcement discretion. The Constitution does not require an exhaustive advance catalogue of every commercial practice that may satisfy a generally worded consumer-protection statute. In *FTC v. Wyndham Worldwide Corp.*, the Third Circuit rejected a materially similar challenge and held that Section 5 of the FTC Act provided adequate notice that deficient cybersecurity practices could be unfair even though cybersecurity was an evolving

19

technological field and no regulation prescribed the precise safeguards required. 799 F.3d 236, 250–59 (3d Cir. 2015).

The same is true here. A person of ordinary intelligence could reasonably foresee that designing, maintaining, and commercializing a product that generated sexualized images of identifiable, nonconsenting adults and children at enormous scale, while maintaining inadequate safeguards and continuing to monetize the functionality after notice of the abuse, could be found to cause substantial, unavoidable consumer injury unsupported by countervailing benefits.

Defendants' First Amendment argument fares no better. *First*, the City's independent challenge to Defendants' deceptive representations and omissions does not implicate protected speech because misleading commercial speech receives no First Amendment protection. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 563 (1980).

*Second*, the City's unfairness theory challenges Defendants' own commercial conduct—how Grok's image-generation tools were designed, deployed, safeguarded, distributed, and monetized. Liability does not turn on whether the City approves of a viewpoint or message expressed in a generated image, and generally applicable regulation of commerce does not become content-based merely because the regulated product can be used to create speech.

Defendants' reliance on *Reno v. ACLU*, 521 U.S. 844, 870 (1997) is misplaced. Mot. at 19. *Reno* addressed a federal criminal statute that directly proscribed broad, imprecisely defined categories of online speech itself—"indecent" and "patently offensive" communications. The CPO instead regulates Defendants' commercial practices, with any effect on resulting images incidental to those duties. Even insofar as the generated images are treated as expressive, that characteristic does not itself foreclose application of generally applicable law. Courts permit liability for knowingly or recklessly false portrayals and, in appropriate circumstances, nonconsensual

commercial appropriation of identity, subject to the governing constitutional safeguards. *See, e.g.*, *Cantrell v. Forest City Publ'g Co.*, 419 U.S. 245, 249–54 (1974) (reinstating a false-light judgment where the evidence supported findings that the reporter knowingly or recklessly published calculated falsehoods about the plaintiff); *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 574–79 (1977) (holding that the First Amendment did not bar a right-of-publicity claim where a broadcaster aired a performer's entire act without consent).

Finally, the Complaint's request for prospective relief does not render the underlying liability standard unconstitutional. No injunction has been entered, and the precise form of relief—if liability is established—must be tailored to the practices proven and consistent with the First Amendment. Defendants' citations to *Alexander v. United States*, 509 U.S. 544, 550 (1993), and *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023), do not compel dismissal at the pleading stage. Mot. at 19. Neither case resembles this one: *Alexander* addressed a completed RICO forfeiture order stripping a defendant of an entire expressive-media business, including presumptively protected, non-obscene inventory and future publications—a remedy the Court considered only because it had already been imposed with a fixed scope. And *303 Creative* addressed a law that would have compelled an individual to create specific expressive content celebrating a message that conflicted with her religious beliefs. Here, no order has been entered, the scope of any eventual injunction remains to be determined, and the CPO does not require Defendants to create or endorse any message.

The CPO therefore supplies a developed and objective unfairness standard, and the Complaint challenges concrete commercial practices falling within that standard's core. Applying it here is neither unconstitutionally vague nor inconsistent with the First Amendment.

21

**C.**    **The challenged practices occurred in sales or offers for sale in Baltimore.**

Defendants argue that the Complaint fails to connect the challenged conduct both to Baltimore and to a sale or offer for sale. Mot. at 19–22. The Complaint alleges both. *First,* Defendants purposefully offered and distributed the X and Grok apps, and related marketing to Baltimore consumers; possessed location information identifying users in the City; and conveyed the challenged representations to Baltimore residents through its marketing and Terms and Policies. Compl. ¶¶ 13–17, 61. Indeed, *no* Baltimore consumers were able to access the X or Grok apps without being exposed to the Terms and Policies containing the challenged representations. The City thus alleges more than the incidental appearance in Baltimore of content generated elsewhere.[28]

*Second*, Defendants allegedly made false statements and omissions directly in the offer of sale itself. For example, Defendants' purported prohibition on nonconsensual sexual content appears in the X and X.AI Terms and Policies—which form the "User Agreement." Compl. ¶¶ 66–79. These User Agreements constituted offers of sale under the CPO and MCPA, which must be construed liberally and consistently with federal interpretations of Section 5(a)(1) of the FTC Act. MCPA § 13-105.

Defendants offered two tiers of licenses to all Baltimore consumers who accessed their websites or mobile apps: a loss-leader "free" version and a paid premium subscription. Both are "consumer contract[s] . . . between a merchant licensor and a consumer." Md. Code Ann., Com. Law § 22-102(a)(16). And both involve valuable consideration. The so-called "free" version gave users access to Defendants' "software," including the ability to prompt Grok to generate images on X, in exchange for users' monetizable data and attention. *See* Compl. ¶¶ 14–17, 54–58, 60.

---

[28] Defendants provide no authorities that support its implication that Rule 9(b)'s heightened standard applies to this element, Mot. at 21, which it does not. *See Spaulding*, 714 F.3d at 781.

Defendants also offered all users a paid subscription. Before January 8, 2026, it offered paying users "increased usage limits on Grok."[29] After January 8, Defendants limited Grok's image-generation and editing features to paying subscribers, invited them to "subscribe to unlock these features," and linked them to X Premium subscriptions. Compl. ¶¶ 55–57. That is a direct offer to sell the challenged functionality.

Regardless, both the basic and premium licensing agreements are covered by the CPO. It is well established that modern digital platforms fall comfortably within the scope of consumer-protection statutes, including the MCPA, even in the absence of cash payment. *Contra* Mot. at 21. In *In re Social Media,* a multistate action in which Maryland's own Attorney General was among the thirty-four state plaintiffs asserting claims under state consumer protections statutes, including the MCPA—the court held that users adequately alleged an MCPA-covered transaction where Meta provided platform access in exchange for users' personal data, attention, and time spent viewing advertisements. 753 F. Supp. 3d at 909–10. The court rejected the premise that a digital platform escapes consumer-protection law merely because its users exchange commercially valuable data, attention, and time rather than cash. *Id*. ("[A] social media company cannot exempt itself from consumer-protection law because its consumers exchange their personal data and time for a product or service rather than cash for goods.").

The Federal Trade Commission likewise recognizes that social-media services offered at a zero monetary price remain qualifying commercial exchanges because consumers "effectively pay through their data and information," which platforms monetize through advertising. Fed. Trade Comm'n, *A Look Behind the Screens*, 2024 WL 4272104, at *13 (Sept. 2024). That interpretation

---

[29] X, *About X Premium*, https://web.archive.org/web/20260301091219/https://help.x.com/en/using-x/x-premium (archived URL dated Mar. 1, 2026).

is entitled to "due consideration and weight" under MCPA § 13-105 and reinforces the CPO and MCPA must be read to cover Defendants' licensing agreements as offers of sale.

Defendants are simply wrong that the challenged practices were collateral to the offer of sale. The misrepresentations and omissions go to the capabilities, restrictions, and safeguards of the same product they offered consumers. Compl. ¶¶ 61–90. And the unfairness theory challenges design, access-control, distribution, and monetization decisions that defined the functionality offered and the terms on which consumers received it. *Id.* ¶¶ 33–60, 80–95, 113. Those practices were part of the offering—not collateral conduct following an unrelated transaction.

*Morris v. Osmose Wood Preserving*, Mot. at 19–20, is therefore distinguishable. 667 A.2d 624, 635 (Md. 1995). There, component manufacturers made representations to builders but neither sold nor advertised the completed homes to the consumers; the statements were not necessarily or directly transmitted as part of the consumer sales. *Id.* at 635–37. Here, Defendants themselves offered the X and Grok apps to Baltimore consumers and directly presented the challenged descriptions, restrictions, and Terms and Policies as governing the products' use. No intermediary separated Defendants' representations from the consumer offering.

Nor does *Lemma v. CalAtlantic Grp., Inc.*, Mot. at 21, support Defendants' position. There, the court distinguished representations made in a warranty as part of a home sale from statements made by repair personnel *months after* the completed transaction. 643 F. Supp. 3d 564, 572–74 (D. Md. 2022). Here, Defendants' descriptions of their products and Terms and Policies allegedly governed an ongoing consumer relationship, and at all relevant times, Defendants offered enhanced Grok usage for a price.

The Complaint thus plausibly alleges that Defendants' statements and practices occurred in Baltimore and formed part of their sale or offer of X and Grok apps to Baltimore consumers.

24

**D.      The CPO would not exceed the City's authority under Maryland law.**

Defendants conflate the CPO's legal reach with the possible operational consequences of compliance by a nationwide business. Mot. at 22–23. The CPO expressly applies only to unfair or deceptive practices occurring "[i]n Baltimore City." CPO § 4-2. Consistent with that limit, the City seeks penalties for practices directed to and occurring in Baltimore consumer transactions and relief preventing their recurrence against Baltimore residents. Compl. ¶¶ 13–17, 96–107, 113–17.

*Engage Armament LLC v. Montgomery Cnty.*, Mot. at 22, involved a materially different ordinance: a firearm prohibition directly governed holders of state-issued permits traveling on public highways from elsewhere in Maryland and beyond. 356 A.3d 79, 118–21 (Md. 2026). The CPO imposes no comparable obligation on persons or transactions outside Baltimore. It regulates Defendants only insofar as they offer Grok and engage in the challenged practices within the City.

*Assanah-Carroll v. Law Offs. of Edward J. Maher, P.C.* is also narrower than Defendants suggest, Mot. at 22, as it held that Baltimore could not use a local ordinance to alter the uniform remedies available in a private action under the MCPA. 281 A.3d 72, 91-93 (Md. 2022). The City does not seek to modify a private MCPA cause of action or its remedies. It is publicly enforcing a separate local ordinance against local violations. Indeed, the General Assembly expressly contemplated local consumer-protection enforcement and authorized Baltimore, within its authority, to enact protections more stringent than the statewide minimum. MCPA §§ 13-102(b)(1), 13-103(b).

The fact that Defendants employ uniform nationwide policies and product architecture does not make local enforcement extraterritorial. Otherwise, a national business could evade local consumer-protection laws merely by standardizing its practices. Any decision by Defendants to adopt a platform-wide solution would be a consequence of their chosen business model, not an expansion of the CPO's legal operation.

25

Nor does the prayer for relief establish otherwise. No injunction has been entered, and any ultimate order must be tailored to the violations proven and the City's territorial authority. *See Luskin's*, 726 A.2d at 724–25. Because the CPO regulates only practices occurring in Baltimore and any relief must remain correspondingly tailored, its application here is a valid exercise of the City's home-rule authority.

## II.    SECTION 230 DOES NOT BAR THE CITY'S CLAIMS

The Communications Decency Act, 47 U.S.C. § 230(c)(1) ("Section 230"), "does not protect entities for their own speech." *Henderson*, 53 F.4th at 126 n.22. And this case turns entirely on Defendants' own content and conduct—the words in their marketing and Terms and Policies, the images they generated through Grok, and the design choices they made in programming Grok.

To establish immunity under Section 230, Defendants must establish that: (1) they are providers or users of an interactive computer service; (2) the City seeks to hold them responsible as the publisher or speaker of information; and (3) that information was provided by another information content provider. *Id.* at 119.

### A.    The City's deception and unfairness theories hold Defendants liable for their own conduct and expression as information content providers.

Section 230(c)(1) provides no immunity for content that the provider itself creates or develops. *Henderson*, 53 F.4th at 126–29; *Force v. Facebook, Inc.* 934 F.3d 53, 68 (2d Cir. 2019); *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 409 (6th Cir. 2014); *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1168 (9th Cir. 2008). An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information." § 230(f)(3). Immunity only applies when the content at issue was provided by *another* information content provider. *Henderson*, 53 F.4th at 126 n.22

26

(explaining Section 230 only protects website operators "when they serve as a conduit for others' speech").

Defendants provided the challenged content, so Section 230 provides no immunity. Defendants—not their users—authored the statements that X prohibits "deceptively shar[ing] synthetic or manipulated media that are likely to cause harm" and only permits "consensually produced and distributed adult nudity or sexual behavior." Compl. ¶¶ 70–71. Defendants' chatbot—not their users—generated the millions of sexualized deepfakes that made those statements false or misleading. *Id.* ¶¶ 3, 10, 44, 77. And Defendants marketed and deployed Grok through the public @Grok account on X, where Grok generated and publicly posted millions of images—including at least 1.8 million sexualized images over nine days. *Id.* ¶¶ 36–37, 51–53, 97, 101–02. Section 230 does not shield liability based on Defendants' own statements merely because Grok created and published outputs that make those statements false or misleading. *See Henderson*, 53 F.4th at 126 n.22.

The City's unfairness theory also turns on Defendants' own conduct and content. A platform has no Section 230 immunity when it "materially contributed to what made the content itself unlawful." *Henderson*, 53 F.4th at 127 (citation modified) (holding that defendant became an information content provider by altering third-party court records and introducing the misleading features of the resulting reports). That is precisely what the Complaint alleges.

Here, the relevant information is the final image generated by Grok—not merely the user's prompt or source photograph. The Complaint alleges that Grok "undresses" the harassed individual, generating novel content and falsely depicting unwitting victims in sexualized or degrading scenarios. Compl. ¶¶ 3, 34, 39, 44. It also alleges an instance where Grok generated a "fully topless" video even though the user did not request removal of the depicted person's

27

clothing. *Id.* ¶ 99. Defendants' design, distribution, and marketing decisions materially contribute to every deepfake Grok produces. Indeed, Defendants designed Grok's output filters—choosing to omit industry-standard safeguards against sexually-abusive content implemented by competitors. *Id.* ¶ 89–90, 113(h).

Defendants respond that users selected the photographs and submitted the prompts. Mot. at 26–28. But § 230(f)(3) expressly encompasses responsibility "in whole or in part." A user's contribution does not preclude Defendants from also creating or developing the resulting information. *See Roommates.com*, 521 F.3d at 1167 (holding that Section 230 denies immunity where a platform materially contributes to the unlawful content, even if it does not "entirely" originate it).[30]

Likewise, Defendants are wrong that the City must show Grok "prioritizes the creation" of sexualized content. Mot. at 26 (citing *M.P. ex rel. Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 525 (4th Cir. 2025)). *M.P.* involved an algorithm that arranged, sorted, and recommended preexisting content supplied by Facebook users, and the plaintiff could not establish the alleged defect without proving that Facebook prioritized the dissemination of one category of third-party content over another. 127 F.4th at 525–26. The court emphasized that, apart from directing third-party content, Facebook's algorithm had "little, if any, substantive content." *Id.* at 525. The opposite is alleged here. The City does not challenge Grok's ranking or dissemination of preexisting third-party speech. It alleges that Grok's generative model itself synthesizes new images and contributes the sexualized features that make them harmful. Compl. ¶¶ 3, 10, 39, 44,

---

[30] Defendants' Microsoft Word and Photoshop analogies also assume the disputed premise that Grok merely reproduces or mechanically executes content fully supplied by a user. Mot. at 28. The Complaint instead alleges that Grok synthesizes a new image and may supply sexualized elements absent from the source photograph and prompt. Compl. ¶¶ 3, 39, 44, 99. That's the whole point of "undressing" a "dressed" image. Resolving this factual dispute is inappropriate in a motion to dismiss.

99. Proving that theory does not require the City to challenge any traditional editorial decision concerning third-party content.[31]

This case, therefore, has nothing to do with moderating user-generated content: the Complaint never alleges that Defendants should have deleted prompts written by users. The content at issue was created by Defendants—in their User Agreements, marketing materials, and Grok outputs. Those outputs establish the falsity of Defendants' claims, the materiality of their omissions, and the unfairness of their design and marketing decisions.

Even if the City did challenge policies on moderating user-generated content, Defendants would still not be shielded. Section 230 "does not immunize [companies] from breaking their promises" since "the promise itself is actionable separate from the moderation action." *Est. of Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1181–82 (9th Cir. 2024); *accord In re Social Media,* 753 F. Supp. 3d at 885 ("Any theories of deceptive acts and practices that target Meta's alleged affirmative misrepresentations independent of platform features survive Section 230.").

Defendants' cited cases, Mot. at 26, are easily distinguishable because, unlike here, they involved generalized safety or moderation statements that faulted platforms for their handling of *third-party* communications—not their own. *See Doe v. Grindr Inc.*, 128 F.4th 1148, 1152–54 (9th Cir. 2025); *Doe v. Discord Inc.*, 2026 WL 1067574, at *12 (N.D. Ohio Apr. 20, 2026); *Bogard v. TikTok Inc.*, 2025 WL 3637035, at *19 (N.D. Cal. Dec. 15, 2025).

And Defendants' policy argument concerning the broader AI industry does not change the statutory test. Defendants cannot seriously claim holding them accountable for deceptively

---

[31] *See Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092–94 (9th Cir. 2021) (design claim arose from Snap's "distinct capacity as a product designer," and user content could serve as evidence of a defect without converting the claim into publisher liability); *Doe 1 v. Twitter, Inc.*, 148 F.4th 635, 644–46 (9th Cir. 2025) (reporting-infrastructure design theory was not barred because the duty could be satisfied without monitoring or removing third-party content); *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851–53 (9th Cir. 2016) (duty to issue defendant's own warning did not treat it as the publisher of third-party content).

marketing a product that "undresses" children would threaten "national security." Mot. at 29. The City does not contend that every AI provider is liable for every AI output. It alleges specific facts showing that Grok generated and materially contributed to the sexualized content at issue. Those allegations preclude § 230(c)(1) immunity at the pleading stage.[32]

Accepted as true, the Complaint plausibly alleges that Defendants authored their own false statements and materially contributed to the nonconsensual, sexualized character of Grok's deepfakes—violating Defendants' own contractual rules. That makes Defendants information content providers and strips them of any Section 230 immunity.

### B.      Section 230(c)(2)(A) does not immunize the conduct challenged by the City.

Section 230(c)(2)(A) protects only good-faith actions taken to restrict access to objectionable material. 47 U.S.C. § 230(c)(2)(A). Nothing in the Complaint alleges a good-faith effort to restrict access to deepfakes generated by Defendants. Putting Grok's editing functions behind a paywall on X in January 2026 did not meaningfully restrict access to nonconsensual intimate imagery—it monetized it. And even if that action qualified, § 230(c)(2)(A) would immunize only the restriction itself—not Defendants' separate representations, design decisions, or continued commercialization of the underlying functionality. Section 230(c)(2)(A) supplies no basis for dismissing the City's claim.

### CONCLUSION

For the foregoing reasons, the City respectfully requests that the Court deny Defendants' motion to dismiss in its entirety. Alternatively, should the Court conclude that any allegations are insufficiently pleaded, the City respectfully requests leave to amend.

---

[32] *Doe v. X Corp.*, Mot. at 25, does not help Defendants. 821 F. Supp. 3d 632 (N.D. Tex. 2026). That case did not involve Grok generating novel, nonconsensual intimate imagery. It involved an X user re-posting a plaintiff's commercial pornography—a classic scenario where Section 230 immunizes a platform from being treated as the publisher of user-generated content. *Id.* at 635.

Dated: July 29, 2026                                Respectfully submitted,

                                                    EBONY M. THOMPSON
                                                    Baltimore City Solicitor


                                                    */s/ Amy Keller*

                                                    Sara Gross (Bar No. 27704)
                                                    Chief Solicitor
                                                    Natalie Neill
                                                    Assistant Solicitor
                                                    Zachary Babo
                                                    Assistant Solicitor
                                                    Baltimore City Department of Law
                                                    100 North Holliday Street
                                                    Baltimore, Maryland 21202
                                                    Tel.: 410-396-3947
                                                    sara.gross@baltimorecity.gov

                                                    Adam J. Levitt*
                                                    Amy E. Keller (Bar No. 20816)
                                                    Daniel R. Ferri (admitted *pro hac vice*)
                                                    Rebecca Trickey (admitted *pro hac vice*)
                                                    DICELLO LEVITT LLP
                                                    Ten North Dearborn Street, Sixth Floor
                                                    Chicago, Illinois 60602
                                                    Tel.: (312) 214-7900
                                                    alevitt@dicellolevitt.com
                                                    akeller@dicellolevitt.com
                                                    dferri@dicellolevitt.com
                                                    rtrickey@dicellolevitt.com

                                                    Corban S. Rhodes*
                                                    Emma L. Bruder (admitted *pro hac vice*)
                                                    DICELLO LEVITT LLP
                                                    485 Lexington Avenue, Tenth Floor
                                                    New York, New York 10017
                                                    Tel: (646) 933-1000
                                                    crhodes@dicellolevitt.com
                                                    ebruder@dicellolevitt.com

                                                    Scott A. Gilmore (admitted *pro hac vice*)
                                                    DiCello Levitt LLP

31

810 17th Street NW, Suite 430
Washington, DC 20036
Tel.: (202) 975-2288
sgilmore@dicellolevitt.com

*\* pro hac vice motion to be filed*

*Counsel for the Mayor and City Council of Baltimore, Maryland*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of July, 2026, copies of the foregoing and the proposed order submitted herewith were filed and served upon all counsel of record via the CM/ECF system.

/s/ Amy Keller
Amy Keller
