**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**Northern Division**

MAYOR AND CITY COUNCIL OF BALTIMORE, *ex rel.* Ebony M. Thompson,

Plaintiff,

v.

X CORP., et al.,

Defendants.

Civil Action No. 1:26-cv-02103-ELH

**REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM ON BEHALF OF DEFENDANTS X CORP., X.AI CORP., AND X.AI LLC**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. THE CITY REMAINS UNABLE TO STATE A CLAIM UNDER THE CPO .......... 2

A. The City's Shifting "Services" And "Goods" Theories Fail .......... 2

B. The City Fails To Identify An Actionable Statement Or Practice .......... 6

1. The City Fails To Salvage Its Deception Theory .......... 6

2. The City's Unfair-Trade-Practices Claim Is Not Legally Viable .......... 9

C. The City Fails To Establish That Any Targeted Statements Or Practices Occurred In Baltimore In An Offer For Sale .......... 11

D. The City Fails To Refute The Local-Law Problems That Its Claim Creates .......... 12

II. THE CITY'S OPPOSITION CONFIRMS THAT SECTION 230 APPLIES .......... 13

CONCLUSION .......... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelakun v. Adelakun*,
338 A.3d 614 (Md. 2025) ....................................................................................3

*Alston v. United Collections Bureau*,
2014 WL 859013 (D. Md. Mar. 4, 2014)...............................................................2

*Amy v. Apple Inc.*,
--- F. Supp. 3d ---, 2026 WL 2031817 (N.D. Cal. July 13, 2026) ..........................15

*AOL v. St. Paul Mercury Ins. Co.*,
347 F.3d 89 (4th Cir. 2003) ..................................................................................3

*Bezmenova v. Ocwen Fin. Corp.*,
2013 WL 1316445 (D. Md. Mar. 27, 2013).............................................................7

*Cash & Carry Am., Inc. v. Roof Sols., Inc.*,
117 A.3d 52 (Md. Ct. App. 2015)..........................................................................3

*Doe v. Grindr Inc.*,
128 F.4th 1148 (9th Cir. 2025) ...........................................................................13

*Engage Armament LLC v. Montgomery Cnty.*,
356 A.3d 79 (Md. 2026) ......................................................................................12

*Giovani Carandola, Ltd. v. Bason*,
303 F.3d 507 (4th Cir. 2002) ..............................................................................14

*Green v. H&R Block, Inc.*,
735 A.2d 1039 (Md. 1999) ...............................................................................6, 8

*Henderson v. Source for Pub. Data, L.P.*,
53 F.4th 110 (4th Cir. 2022) ..................................................................13, 14, 15

*Heward v. Bd. of Educ. of Anne Arundel Cnty.*,
2023 WL 6381498 (D. Md. Sept. 29, 2023) ............................................................2

*Holiday Universal, Inc. v. Montgomery Cnty.*,
833 A.2d 518 (Md. 2003) ....................................................................................12

*In re Soc. Media*,
753 F. Supp. 3d 849 (N.D. Cal. 2024) .................................................................11

*IGEN Int'l, Inc. v. Roche Diagnostics GmbH*,
335 F.3d 303 (4th Cir. 2003) ....................9

*Legg v. Castruccio*,
642 A.2d 906 (Md. Ct. App. 1994) ....................10

*Lemma v. CalAtlantic Grp., Inc.*,
643 F. Supp. 3d 564 (D. Md. 2022) ....................12

*M.P. ex rel. Pinckney v. Meta Platforms Inc.*,
127 F.4th 516 (4th Cir. 2025) ....................15

*Rogan v. Baltimore & O. R. Co.*,
52 A.2d 261 (Md. 1947) ....................8

*Springs v. Ally Fin., Inc.*,
475 F. App'x 900 (4th Cir. 2012) ....................2

*Williams v. Lendmark Fin. Servs., Inc.*,
2014 WL 1255854 (D. Md. Mar. 25, 2014) ....................3

*Zeran v. Am. Online, Inc.*,
129 F.3d 327 (4th Cir. 1997) ....................15

**Statutes & Rules**

47 U.S.C. § 230(c)(1) ....................13, 14, 15

47 U.S.C. § 230(c)(2)(a) ....................15

Baltimore City Code art. 2, § 4-1(11) ....................11

Baltimore City Code art. 2, § 4-2 ....................4

Fed R. Civ. P. 9(b) ....................6

Md. Code, Com. Law § 2-105(1) ....................3

Md. Code, Com. Law § 9-102(44) ....................3

Md. Code, Com. Law § 13-101(i) ....................11

Md. Code, Com. Law § 13-101(j) ....................6

Md. Code, Com. Law § 13-101(j)(3) ....................5

Md. Code, Com. Law § 13-101.1 ....................4

Md. Code, Com. Law § 13-104(1) ....................5, 6

Md. Code, Com. Law § 13-104(3) ........ 5

Md. Code, Com. Law § 13-302 ........ 8

Md. Code, Com. Law § 22-102(a)(10) ........ 4

Md. Code, Com. Law § 22-102(a)(12) ........ 4

Md. Code, Com. Law § 22-102(a)(33) ........ 4

Md. Code, Crim. Law § 3-809 ........ 10

TAKE IT DOWN Act, Pub. L. No. 119–12, 139 Stat. 55 ........ 10, 11

**Other Authorities**

*Good*, Merriam-Webster, https://tinylink.net/lPuLy (last visited Aug. 19, 2026) ........ 3

*Goods*, Black's Law Dictionary (12th ed. 2024) ........ 3

*Grok's 'Spicy' Video Setting Instantly Made Me Taylor Swift Nude Deepfakes*, The Verge (Aug. 5, 2025), https://tinylink.net/i2ad3 ........ 14

*Movable*, Black's Law Dictionary (12th ed. 2024) ........ 3

S. Hrg. 118-497 (Jan. 31, 2024), https://tinylink.net/JWitL ........ 9

*Tangible*, Black's Law Dictionary (12th ed. 2024) ........ 3

## INTRODUCTION

The City of Baltimore seeks to use an ordinance to regulate emerging AI platforms nationwide. Yet its opposition brief concedes many of the legal defects identified in Defendants' motion to dismiss, and the City ultimately fails to offer any defensible basis to preserve this suit. For example, although the Complaint repeatedly characterizes Grok and the X platforms as "services," the City all but abandons that theory and for the first time claims that they are "goods." That is wrong. The City's argument rests on a sweeping dictionary definition of the term "goods"—anything with "economic utility"—that would also encompass all services, making nonsense of the statutory scheme. In reality, as confirmed by dictionaries, precedent, and related statutes, the term "goods" in the commercial context refers to *tangible, movable* property. That does not include the computer applications here.

As to the deception theory, the City disavows any claim that Defendants deceived consumers about what other users could do on the platform, resting its deception theory solely on the claim that Defendants themselves create the prohibited content. That is semantics. The Complaint acknowledges how Grok works: Users input commands; Grok produces the requested content. The question is therefore whether any of the allegedly deceptive statements could have led consumers to believe that Grok was incapable of producing the prohibited content in response to user commands. The answer is no. Indeed, there would be no need for "acceptable-use policies" at all if the platform were technically incapable of producing the banned images.

The City's other arguments are equally misplaced. The City concedes that its supposedly independent unfairness theory rises or falls with deception. It erroneously contends that it need not show consumer harm while admitting that the CPO does not incorporate the statutory provision that relieves the State of that requirement. And the City's only response to Section 230 is to dispute the basic reality that it is users, not Defendants, who employ Grok to generate content.

For those reasons among others, the Court should dismiss the Complaint with prejudice.

## ARGUMENT

### I. THE CITY REMAINS UNABLE TO STATE A CLAIM UNDER THE CPO

#### A. The City's Shifting "Services" And "Goods" Theories Fail

The City's Complaint solely defines Grok and the X platforms that make Grok available to users as "services." Compl. ¶¶ 3, 14, 16, 17, 19, 25, 26, 29, 34, 45. The Complaint never characterizes any platform or feature at issue as a "good." As the motion explained, however, the CPO limits "services" to certain specified categories, none of which applies here. Mot. 5-8.

Faced with that fatal problem, the City now claims (Opp. 6-10) that both the X platform and the Grok chatbot are actually "goods," with only Grok's "visual design services" qualifying as "services." That is an impermissible attempt to "sandbag" Defendants by raising a theory "not fairly present[ed]" in "the operative complaint." *Springs v. Ally Fin., Inc.*, 475 F. App'x 900, 901 (4th Cir. 2012). "[A] plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of opposition briefing." *Heward v. Bd. of Educ. of Anne Arundel Cnty.*, 2023 WL 6381498, at *16 (D. Md. Sept. 29, 2023) (Hollander, J.). At a minimum, Defendants have not forfeited a response to this new theory by failing to anticipate it in their motion to dismiss, as the City claims (Opp. 7). *Alston v. United Collections Bureau*, 2014 WL 859013, at *14 (D. Md. Mar. 4, 2014).

Sandbagging aside, the City's new "goods" theory is meritless and demonstrates why amendment would be futile and dismissal with prejudice is warranted. The City spins an elaborate statutory argument about the meaning of "consumer goods" (Opp. 6-8), but that argument fails at the first step. The City defines (Opp. 6) "goods" as "something that has economic utility or satisfies an economic want." That expansive definition cannot possibly apply here because it would subsume all *services* as well, rendering meaningless the MCPA's and therefore the CPO's distinction between "goods" and "services" and their narrow definition of "services."

Under a proper analysis, "good" must be given its "natural and ordinary" public meaning in the "context" of the statutory scheme at issue. *Adelakun v. Adelakun*, 338 A.3d 614, 626 (Md. 2025). And in the legal, commercial context, even the City's preferred dictionary recognizes that a "good" is limited to "an item of *tangible movable personal property* having value." *Good*, Merriam-Webster, https://tinylink.net/lPuLy (last visited Aug. 19, 2026) (emphasis added); *see also Goods*, Black's Law Dictionary (12th ed. 2024). Critically, that definition gives both the terms "goods" and "services" separate functions under the statute.

Once "goods" is properly defined, it is clear that neither social-media software platforms nor AI chatbots are "goods." They are not tangible, movable personal property. *Cash & Carry Am., Inc. v. Roof Sols., Inc.*, 117 A.3d 52, 66 (Md. Ct. App. 2015) ("[S]oftware is not tangible personal property."); *AOL v. St. Paul Mercury Ins. Co.*, 347 F.3d 89, 95-96 (4th Cir. 2003) (same). "Tangible" means "[h]aving or possessing physical form." *Tangible*, Black's Law Dictionary (12th ed. 2024). "Movable" means "[p]roperty that can be moved or displaced, such as personal goods." *Movable*, Black's Law Dictionary (12th ed. 2024). The applications here are neither.

That view accords with precedent. Courts interpreting the Maryland Commercial Law Article (of which the MCPA is a part) recognize that "goods" has a specialized, commercial meaning. When a Maryland commercial statute "does not define 'goods,'" courts find that "definitions used elsewhere in the Maryland Commercial Law Article are instructive." *Williams v. Lendmark Fin. Servs., Inc.*, 2014 WL 1255854, at *5 (D. Md. Mar. 25, 2014). Under Section 2-105(1) of the Commercial Law Article, for example, "goods" are limited to "things (including specially manufactured goods) which are movable." And under Section 9-102(44), "computer program[s]" are not "goods" unless they are themselves "embedded in goods." Neither X nor Grok is so embedded in any good.

The City's remaining statutory points are all irrelevant given the meaning of "goods." Although the City cites the MCPA's definition of "consumer" and "consumer contract" (Opp. 6), it does not explain how those words and phrases could override the meaning of "goods" in the phrase "consumer goods." The City then cites definitions from Maryland's Uniform Computer Information Transactions Act about "computer information" and a "computer program." Opp. 6 (quoting Md. Code, Com. Law § 22-102(a)(10), (a)(12)). But the City has overlooked that Act's most relevant provision: It defines "[g]oods" as "all things that are movable," which expressly "does not include computer information." Md. Code, Com. Law § 22-102(a)(33).

Importantly, each of those terms functions to expand the MCPA to cover "consumer contract[s]" that may involve "computer information" or "computer programs." But the MCPA makes clear that a "consumer contract" is *not* the same thing as a "consumer good" by stating that its provisions apply to the "subject matter of a consumer contract … in the same manner they apply to consumer goods and consumer services," all distinct categories. MCPA § 13-101.1. Unlike the MCPA, the CPO does not apply to "consumer contracts" at all. Baltimore City Code art. 2, § 4-2.

As for the only statutory hook alleged in the four corners of the Complaint—that the products at issue are "services"—the City relegates (Opp. 8) it to an "[a]lternativ[e]" argument limited to "Grok's visual design services." But even as so limited, the theory still lacks merit. The City concedes (Opp. 8-10) that Grok's visual-design feature could qualify as a "consumer service" under the CPO only if it is a "subprofessional service." And the City does not contest that the ordinary meaning of the term "subprofessional" is "functioning or qualified to function below the professional level but distinctly above the clerical or labor level and usu[ally] under the supervision of a professionally trained person." Mot. 7. That meaning has no application to AI image-generation features, and the City does not try to show otherwise. *Compare* Opp. 8-9, *with* Mot. 7.

Instead, the City relies (Opp. 9) on a puzzling statutory argument resting on a provision of the MCPA—Section 13-104(3)—that is not incorporated into the CPO. Section 13-104(3) is the MCPA safe harbor for "a publisher or printer of a newspaper, magazine, or other form of printed advertising who broadcasts, publishes, or prints an advertisement which violates this title," but it does not apply to such an entity that "engages in an unfair or deceptive trade practice in the sale of its own goods or services." The City asserts (Opp. 9) that the safe harbor and its exception apply to online publishers; that online publishing activity must thus qualify as a "servic[e]"; that "subprofessional services" is the only category of "services" that could apply; and thus that "subprofessional services" would include the publication of "Grok-generated content."

That argument rests on two independently fatal flaws. First, the safe-harbor provision refers only to publishers and printers who engage in "printed advertising." It accordingly could not support any inference about entities that make software available to users online but do not produce printed materials. Second, nothing in the statute suggests that the published content itself necessarily qualifies as "goods" or "services" (although hard copies of newspapers, magazines, and the like readily satisfy the ordinary definition of "goods"). Rather, the statute means that a publisher or printer of any "form of printed advertising" is not immune from liability if it is advertising its own goods or services. For example, a company that offers appliance-repair services—one of the statutorily defined categories of "services," MCPA § 13-101(j)(3)—could be liable for distributing deceptive printed flyers advertising those services. But that scheme does not support the City's assertion that generating visual content online itself qualifies as "subprofessional services."

Nor is there any inconsistency between applying the plain meaning of "subprofessional services" and MCPA Section 13-104(1)'s exclusion of "professional services." Indeed, the

provisions actually complement each other. Section 13-104(1) emphasizes that "professional services" offered by certain occupations (like lawyers, doctors, and accountants) are exempt. And Section 13-101(j) then clarifies that not every service offered by a professional's *office* will be exempt: The subprofessional work offered by professionals or by their employees would still be actionable under the MCPA. The City's reliance (Opp. 9-10) on *Green v. H&R Block* is inapposite because that case did not involve questions about the scope of "subprofessional services," and contrary to the City's characterization, the case involved practices related to "facilitat[ing] loans," not tax preparation. 735 A.2d 1039, 1044 (Md. 1999). That particular service, although undertaken by an accounting firm, could plausibly constitute "subprofessional services."

In short, because both theories fail, the Court should dismiss the Complaint with prejudice.

### B. The City Fails To Identify An Actionable Statement Or Practice

#### 1. The City Fails To Salvage Its Deception Theory

***Deception.*** The Complaint's allegations of deception do not meet the plausibility standard, much less Rule 9(b). *See* Mot. 9-12. The City acknowledges that a policy restricting certain types of content on Defendants' platforms is not rendered false merely because some people misuse the platforms to create and share the forbidden content. *See* Opp. 1, 10; Mot. 9-12. Instead, the City now stakes (Opp. 10) its deception claim on a single theory: Defendants' policies are false because *Defendants themselves* generated the restricted content on their platforms. On that view, Defendants acted deceptively because they supposedly violated their own restrictions for users.

That theory is just wordplay. The Complaint repeatedly acknowledges the way that Grok works: It "generate[s] novel content" only "*in response to user prompts*." Compl. ¶¶ 3, 34 (emphasis added); *see id.* ¶ 85 (creating content in response to "sophisticated user prompts"). Users, not Grok, choose "existing posts or upload a photo," *id.* ¶ 38; users "ask Grok to 'undress' or 'nudify' [those] photos of third parties," *id.* ¶¶ 34-35; and "users … generate images" based on

those inputs "with the '@Grok' chatbot or with the 'edit image' button" on X, *id.* ¶ 36. The only way the Complaint alleges that Grok generates images is in response to users' input.

Given that manner of operation, the question is whether the allegedly deceptive statements could reasonably be understood to mean that Grok lacks the technical capability of producing forbidden content in response to user prompts. Clearly the answer is no. Indeed, the sole plausible inference is the opposite: The only reason to establish rules and zero-tolerance policies for certain sorts of content generation and promotion in the first place is that such activity is technically possible on the platform. For example, the Complaint alleges that Defendants "represent[] that Grok's use policies forbid sexualized depictions of real people and minors." Compl. ¶ 7. But such a "use policy" would be unnecessary if Grok were incapable of generating such images based on user prompts. The Complaint cites no statement by Defendants even remotely suggesting that Grok is *technically incapable* of producing the forbidden content in response to user prompts. That is fatal to the only theory of deception that the City pursues.

The City cites (Opp. 11-12) statements that Grok "does not support uploading photos of real people" and "prevent[s] the creation of deepfakes and non-consensual sexual content." Compl. ¶ 76. But the Complaint draws the quoted language from a third-party website, *see id.* ¶ 76 n.25, and nowhere alleges that Defendants authored, adopted, or published it. A statement the City cannot "impute… to Defendants" cannot form the basis of a CPO claim against them. *Bezmenova v. Ocwen Fin. Corp.*, 2013 WL 1316445, at *3 (D. Md. Mar. 27, 2013).

The City seeks to "reinforce" (Opp. 11) the cracks in its affirmative deception theory by pointing to supposed omissions. But those alleged omissions also focus on Defendants' purported failure to disclose that Grok was capable of generating forbidden content in response to user prompts. Again, Defendants did nothing to create the impression that Grok lacked that capability.

To the contrary, the only reasonable inference from a policy barring users from misusing the platform in that way is that the platform is technically capable of producing such content.

***Injury.*** The Complaint asserts that the City need not prove a consumer injury because MCPA Section 13-302 permits the State to bring an MCPA claim "whether or not any consumer in fact has been misled, deceived, or damaged as a result of [a prohibited] practice." Compl. ¶ 111. But the City now admits that the CPO does not "incorporate MCPA § 13-302" (Opp. 14)—an omission that Maryland courts construe as "intended," *Rogan v. Baltimore & O. R. Co.*, 52 A.2d 261, 266 (Md. 1947). The most reasonable inference is that the City omitted Section 13-302 to ensure that the City *does* need to prove that a Baltimore consumer was injured before invoking the CPO—a limitation that prevents the ordinance from improperly transforming the City into a roving regulator of all advertising and commercial practices for nationwide companies. The City's reliance (Opp. 14) on cases allowing the State to pursue MCPA actions without damages or reliance *based on* Section 13-302 only proves the point.

***Materiality.*** While conceding that it must allege the materiality of any purported misrepresentations or omissions, the City seeks to circumvent its failure to do so by claiming that materiality is invariably a "fact question" (Opp. 13). But the authority cited by the City confirms that materiality can be decided "as a matter of law" when a complaint does "not allow for a reasonable inference of materiality." *H&R Block*, 735 A.2d at 1059. That is the case here. The Complaint does not allege that any supposed deceptive misrepresentation or omission was material to any Baltimore user's decision *to pay* for Grok's features. The City's claim that the Complaint "alleges that the challenged practices affected consumer … purchasing decisions" (Opp. 15) cites a portion of the Complaint that does not contain any such allegation, Compl. ¶¶ 96-106.

The City asserts (Opp. 13), without authority, that the materiality element is "broader" and

could be satisfied if users would not have accepted Defendants' terms and used Defendants' tools and platforms absent deception. That is wrong. The CPO is solely concerned with the materiality of statements made in "the sale" or "offer for sale" of a good or service—a requirement that contemplates an exchange of money. *See infra* p. 11.

***Ms. Yaccarino's Testimony.*** The City claims (Opp. 15) that the *Noerr-Pennington* doctrine does not apply to petitioning activity following a congressional subpoena. But the *Noerr-Pennington* doctrine is a form of "First Amendment immunity," *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 310 (4th Cir. 2003), and the City cites no precedent holding that immunity turns on whether a witness's appearance was voluntary. At any rate, as the City concedes (Opp. 15), the doctrine applies when the "congressional statements sought governmental redress," and Ms. Yaccarino called for Congress to enact "a Federal standard to criminalize the sharing of nonconsensual intimate material," S. Hrg. 118-497 (Jan. 31, 2024), https://tinylink.net/JWitL.

**2. The City's Unfair-Trade-Practices Claim Is Not Legally Viable**

For three reasons, the City's unfair-trade-practices claim fails under the FTC's unfairness framework that the City agrees (Opp. 16-17) controls.

*First*, although the Complaint purports to allege an unfair-trade-practices claim that is "[i]ndependent[] of deception," Compl. ¶ 91, the City repudiates that statement in its opposition. The City now claims (Opp. 16) that its unfairness theory "challenges Defendants' designing, marketing, distributing, and monetizing Grok *while claiming to prohibit the content Grok generates and omitting material facts*." (emphasis added). In other words, its supposedly independent unfair-trade-practices claim relies on the same alleged deception and omissions concerning Defendants' zero-tolerance policy. As explained, those statements and omissions were not deceptive. That problem aside, the City fails to identify a *specific* "operating policy or customary practice" of Defendants' trade that is allegedly unfair. Mot. 16-17 (collecting cases).

The City studiously avoids claiming that merely providing general creative AI tools capable of producing illegal or offensive content is "unfair"—an unsupportable view given that the same could be said of cameras, word-processing applications, and pre-AI photo-editing software.

*Second*, the City fails to identify a "*consumer* injury." *Legg v. Castruccio*, 642 A.2d 906, 916-18 (Md. Ct. App. 1994) (emphasis added). Indeed, the City concedes that its claim is not tied to *consumers* at all, stating (Opp. 18) that "a victim need not use Grok, subscribe to X Premium, or maintain an X account" to be injured. While the distribution of nonconsensual sexual images can cause significant emotional harm, "[e]motional impact" and similarly "subjective types of harm" are not the kinds of harms that "make a practice unfair" in the sense relevant to consumer-protection law. *Legg*, 642 A.2d at 916 (citation omitted). The City cites no authority suggesting that those impacts can nonetheless be labeled as "[u]nwarranted health and safety risks" to qualify as a consumer injury. *Id.* (citation omitted).

*Third*, despite acknowledging (Opp. 18) that "public policy may inform the unfairness analysis," the City fails to articulate an established public policy that supports its claim. That is because there is no prevailing consensus on how to regulate generative AI. The City cites Md. Code, Crim. Law § 3-809 (Opp. 18-19), but that statute does not concern AI; it criminalizes so-called "revenge porn" and provides that "[a]n interactive computer service … is not liable under this section for content provided by another person." And the City fails to dispute that recently adopted federal policy weighs against liability here because it favors a "minimally burdensome" and "national" approach to AI regulation. Mot. 18 (citation omitted). Contrary to the City's suggestion (Opp. 19), the TAKE IT DOWN Act implements this policy by permitting liability for "covered platform[s]" only after affording them actual notice and a fair opportunity to investigate and remove prohibited content. Pub. L. No. 119–12, 139 Stat. 55, 59-61. The City's unfairness

theory thus conflicts with public policy because it would impose hyperlocal and maximally burdensome restrictions on generative AI.

### C. The City Fails To Establish That Any Targeted Statements Or Practices Occurred In Baltimore In An Offer For Sale

As the City concedes (Opp. 22), any unfair or deceptive trade practice must occur in Baltimore in a "sale" or "offer for sale." But as to the Baltimore connection, the City relies primarily on its general jurisdictional allegations that Defendants operate in Baltimore. Opp. 22 (citing Compl. ¶¶ 13-17). Those paragraphs say nothing about Defendants' practices or an "offer for sale" occurring in Baltimore. The only other paragraph that the City relies upon states merely that certain misrepresentations were "conveyed" to Baltimore residents, not that they formed a part of any "sale" or "offer for sale" in Baltimore. Opp. 22 (citing Compl. ¶ 61). That is insufficient.

As to any "sale" or "offer for sale," the City acknowledges (Opp. 23) that "Grok's image-generation and editing features" at issue in this case were not sold until "[a]fter January 8, [2026]." Nonetheless, the City argues (Opp. 23) that nonpaying Grok users would still qualify as having been part of an offer for sale involving Grok because they "exchange … personal data, attention, and time spent viewing advertisements." That is erroneous. Under MCPA Section 13-101(i)—which the CPO incorporates, Baltimore City Code art. 2, § 4-1(11)—a "[s]ale" involves an exchange of "cash or credit." That language renders the City's reliance (Opp. 23) on *In re Soc. Media*, 753 F. Supp. 3d 849 (N.D. Cal. 2024), unpersuasive because the court never analyzed Maryland's explicit monetary requirement. *Id.* at 909. Citing an unverified "web" "archive" from March 2026, the City claims (Opp. 23 & n.29) for the first time that before January 8, 2026, certain Defendants may have "offered paying users 'increased usage limits on Grok.'" That is another improper attempt to inject new facts into the case not found in the Complaint. Regardless, the service at issue here is not usage limits, but access to Grok's image-generation and editing features.

All that leaves the City with are statements in "X Corp.'s rules" and X.AI's "Acceptable Use policy." Compl. ¶¶ 66-79. The City contends (Opp. 22) that those statements were made in a "sale" or "offer for sale" because users were "exposed to" them. But that establishes merely that Defendants' rules and policies "were, at best, made 'in connection with'" the sale of Grok, "not 'in' the sale" itself. *Lemma v. CalAtlantic Grp., Inc.*, 643 F. Supp. 3d 564, 573 (D. Md. 2022) (citation omitted); *see* Mot. 20.

**D. The City Fails To Refute The Local-Law Problems That Its Claim Creates**

The City acknowledges (Opp. 25) that its CPO claim, if successful, will affect Defendants' "uniform nationwide policies and product architecture." That concession alone demonstrates that the City is seeking "significant extraterritorial impact," transforming the CPO into a general law. *Holiday Universal, Inc. v. Montgomery Cnty.*, 833 A.2d 518, 520 (Md. 2003). The City's only rejoinder (Opp. 25) is to fault Defendants for adopting a platform-wide solution. That is irrelevant. It was the gun owners' decision in *Engage Armament LLC v. Montgomery County* to "travel[] on public highways … within 100 yards of a place of public assembly." 356 A.3d 79, 120 (Md. 2026). Nonetheless, the Maryland Supreme Court found that applying the firearm ordinance to those individuals rendered it general in "application" and not local. *Id.* at 119-20. The same is true here if the CPO is applied to Defendants' nationwide marketing, general terms of service, and general design and moderation policies. And contrary to the City's claim (Opp. 25), recognizing the CPO's territorial limit would not give all national businesses a free pass under consumer protection laws. Rather, it would require the City to identify concrete offers to sell to particular Baltimore consumers in Baltimore that violate the CPO and seek civil penalties for those violations.

Finally, it is no answer to say, as the City does (Opp. 26), that any injunctive relief ordered would need to be tailored to the City's territorial authority. The City is asking this Court to order Defendants to "reform their exploitative platform design feature restrictions and enhanced

marketing restrictions." Compl. at Request for Relief. That request cannot be limited to Baltimore.

## II. THE CITY'S OPPOSITION CONFIRMS THAT SECTION 230 APPLIES

***Section 230(c)(1).*** On the Section 230(c)(1) framework (*see* Mot. 24 (listing elements)), the City contests only the third element: whether the "relevant information" was provided by "another information content provider." *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 119 (4th Cir. 2022) (citation omitted). On that element, the City argues (Opp. 26) that its claim is not based on the content and conduct of others, but on Defendants' *own* content and conduct—(1) their "words" in their content-moderation policies, (2) the images Defendants "generated through Grok," and (3) their "design choices" in programming Grok. That argument lacks merit.

*First*, courts routinely find that content-moderation policies are shielded by Section 230(c)(1). *See* Mot. 26 (collecting cases). The City tries to distinguish those cases by asserting (Opp. 29) that they involve companies failing to live up to their "generalized" moderation policies by not taking down certain "*third-party* communications." But that description applies to the City's alleged claim: The Complaint asserts that Defendants' generalized zero-tolerance policy toward nonconsensual sexually explicit images is misleading because third parties prompted Grok to create that material. Compl. ¶¶ 3, 34, 85, 86. That Defendants "authored the statements" in their own policies (Opp. 27) does not change the calculus. That is true in all content-moderation cases. And contrary to the City's assertions (Opp. 29), Defendants' "general statement[s]" about their content-moderation policies were not "specific promise[s]" to "take down" certain conduct that could survive Section 230. *Doe v. Grindr Inc.*, 128 F.4th 1148, 1154 (9th Cir. 2025).

*Second*, no matter how many times the City says it in its Opposition, Defendants did not generate the challenged images through Grok. The City distorts its own Complaint in arguing (Opp. 27) that Defendants "generated the millions of sexualized deepfakes." For instance, the City argues that "Grok 'undresses'" certain "individuals." Opp. 27 (citing Compl. ¶¶ 3, 34, 39, 44).

The cited paragraphs, however, show that Grok generates content "in response to user prompts." Compl. ¶¶ 3, 34, 44; *see also id.* ¶ 40 ("Users can ask Grok to make obscene and offensive modifications."); *id.* ¶ 85 (Grok generates content "in response to more sophisticated user prompts."). It is the users providing the pictures and giving instructions for Grok to follow. The operation of Grok—a neutral creative tool like Word or Photoshop—in following those user prompts does not mean that Defendants themselves materially contribute to the final images.

The City claims (Opp. 28 n.30) that the Complaint alleges that Grok "may supply sexualized elements absent from the source photograph and prompt." But three of the four cited paragraphs say nothing about adding sexualized elements without user instructions. *See* Compl. ¶¶ 3, 39, 44. To the extent the remaining paragraph (¶ 99) suggests some independent sexualization, that example suffers from at least two problems. First, that example is not free of user direction. The user directed Grok to produce a picture of a specific celebrity at "Coachella with the boys," told Grok to make a video out of one of the resulting images, and instructed Grok to make the video "spicy," resulting in a partially nude depiction of the celebrity. Jess Weatherbed, *Grok's 'Spicy' Video Setting Instantly Made Me Taylor Swift Nude Deepfakes*, The Verge (Aug. 5, 2025), https://tinylink.net/i2ad3. That single, anecdotal incident hardly suggests that Grok systematically adds sexualized imagery without user direction. Second, sexualized elements—like naked bodies—are not what "made the content itself 'unlawful.'" *Henderson*, 53 F.4th at 127; *see Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 511 (4th Cir. 2002). As the City concedes (Opp. 2), what makes the final sexualized photos unlawful is that they are images of "real people" who did not consent. And lack of consent can only be introduced by users; no allegation in the Complaint suggests otherwise. Thus, Grok did not "directly and materially contribute" to the unlawful nature of the final images. *Henderson*, 53 F.4th at 127 (citation omitted).

*Third*, the City's design theory fails for the same reason. The City ignores the cases holding that the design of online algorithms or tools that prioritize what type of content to promote falls within Section 230. *See* Mot. 26; *see also M.P. ex rel. Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 525 (4th Cir. 2025) (Section 230 covers the way "Facebook's algorithm was designed"); *Amy v. Apple Inc.*, --- F. Supp. 3d ---, 2026 WL 2031817, at *7 (N.D. Cal. July 13, 2026) (holding that the choice not to use "industry-standard safeguards" to scan and remove sexualized images on online platforms "is a choice related to content moderation" protected by Section 230). Those are the kind of "design decisions" that the City attempts to hold Defendants liable for. *See, e.g.*, Opp. 28 ("Defendants designed Grok's output filters—choosing to omit industry-standard safeguards against sexually-abusive content"). To circumvent that authority, the City asserts (Opp. 28-29) that it concerns the organizing and selecting of third-party content, whereas its claim is about Defendants' own content produced through Grok. As explained, that argument fails.

***Section 230(c)(2)(A).*** The City states (Opp. 30) that Section 230(c)(2)(A) does not apply because the City does not challenge Defendants' "good-faith effort to restrict access to deepfakes." But it plainly does. The Complaint alleges the steps that Defendants have taken to address sexualized images are insufficient. Compl. ¶¶ 80-85, 89-90. Even in its response, the City asserts (Opp. 30) that one restriction—a paywall—was insufficient to stop the unlawful content. That only highlights that the City is attacking Defendants for moderating Grok imperfectly. If allowed to survive, such a claim would produce the "chilling effect" on content moderation that Section 230(c)(2)(A) was enacted to prevent. *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997).

## CONCLUSION

The Court should dismiss the Complaint with prejudice.

Dated: August 21, 2026

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Jonathan G. Cooper*

Jonathan G. Cooper (D. Md. Bar No. 21345)
555 13th Street NW Suite 600
Washington, D.C. 20004
(202) 538-8000
jonathancooper@quinnemanuel.com

Christopher Clore (*pro hac vice*)
William Jackson Vallar (*pro hac vice*)
295 5th Ave. 9th Floor
New York, NY 10016
(212) 849-7000
christopherclore@quinnemanuel.com
jackvallar@quinnemanuel.com

John F. Bash (*pro hac vice*)
300 West 6th St, Suite 2010
Austin, TX 78701
(737) 667-6100
johnbash@quinnemanuel.com

Nicholas J. Caluda (*pro hac vice*)
700 Louisiana Street Suite 3900
Houston, TX 77002
(713) 221-7000
nicocaluda@quinnemanuel.com

Nolan K. Anderson (*pro hac vice*)
1109 First Avenue Suite 210
Seattle, WA 98101
(206) 905-7000
nolananderson@quinnemanuel.com

*Counsel for X Corp., X.AI Corp., and X.AI LLC*